## UNITED STATES *v.* SEEGER.

No. 50.   Argued November 16–17, 1964.—Decided March 8, 1965.*

---

*Together with No. 51, *United States* v. *Jakobson,* on certiorari to the same court, and No. 29, *Peter* v. *United States,* on certiorari to the United States Court of Appeals for the Ninth Circuit.

164

Solicitor General Cox argued the cause for the United States in all cases. *Assistant Attorney General Miller* was with him on the briefs in all cases. *Ralph S. Spritzer* was with him on the briefs in Nos. 50 and 51, and *Marshall Tamor Golding* was with him on the briefs in No. 50.

*Duane B. Beeson* argued the cause and filed a brief for petitioner in No. 29.

*Kenneth W. Greenawalt* argued the cause and filed a brief for respondent in No. 50.

*Herman Adlerstein* argued the cause and filed a brief for respondent in No. 51.

Briefs of *amici curiae,* urging affirmance in Nos. 50 and 51 and reversal in No. 29, were filed by *Alfred Lawrence Toombs* and *Melvin L. Wulf* for the American Civil Liberties Union, and by *Leo Pfeffer, Shad Polier, Will Maslow* and *Joseph B. Robison* for the American Jewish Congress. Briefs of *amici curiae,* urging affirmance in No. 50, were filed by *Herbert A. Wolff, Leo Rosen, Nanette Dembitz* and *Nancy F. Wechsler* for the American Ethical Union, and by *Tolbert H. McCarroll, Lester Forest* and *Paul Blanshard* for the American Humanist Association.

MR. JUSTICE CLARK delivered the opinion of the Court.

These cases involve claims of conscientious objectors under § 6 (j) of the Universal Military Training and Service Act, 50 U. S. C. App. § 456 (j) (1958 ed.), which exempts from combatant training and service in the armed forces of the United States those persons who by

reason of their religious training and belief are conscientiously opposed to participation in war in any form. The cases were consolidated for argument and we consider them together although each involves different facts and circumstances. The parties raise the basic question of the constitutionality of the section which defines the term "religious training and belief," as used in the Act, as "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code." The constitutional attack is launched under the First Amendment's Establishment and Free Exercise Clauses and is twofold: (1) The section does not exempt nonreligious conscientious objectors; and (2) it discriminates between different forms of religious expression in violation of the Due Process Clause of the Fifth Amendment. Jakobson (No. 51) and Peter (No. 29) also claim that their beliefs come within the meaning of the section. Jakobson claims that he meets the standards of § 6 (j) because his opposition to war is based on belief in a Supreme Reality and is therefore an obligation superior to one resulting from man's relationship to his fellow man. Peter contends that his opposition to war derives from his acceptance of the existence of a universal power beyond that of man and that this acceptance in fact constitutes belief in a Supreme Being, qualifying him for exemption. We granted certiorari in each of the cases because of their importance in the administration of the Act. 377 U. S. 922.

We have concluded that Congress, in using the expression "Supreme Being" rather than the designation "God," was merely clarifying the meaning of religious training and belief so as to embrace all religions and to exclude essentially political, sociological, or philosophical views. We believe that under this construction, the test of belief

"in a relation to a Supreme Being" is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption. Where such beliefs have parallel positions in the lives of their respective holders we cannot say that one is "in a relation to a Supreme Being" and the other is not. We have concluded that the beliefs of the objectors in these cases meet these criteria, and, accordingly, we affirm the judgments in Nos. 50 and 51 and reverse the judgment in No. 29.

### THE FACTS IN THE CASES.

No. 50: Seeger was convicted in the District Court for the Southern District of New York of having refused to submit to induction in the armed forces. He was originally classified 1–A in 1953 by his local board, but this classification was changed in 1955 to 2–S (student) and he remained in this status until 1958 when he was reclassified 1–A. He first claimed exemption as a conscientious objector in 1957 after successive annual renewals of his student classification. Although he did not adopt verbatim the printed Selective Service System form, he declared that he was conscientiously opposed to participation in war in any form by reason of his "religious" belief; that he preferred to leave the question as to his belief in a Supreme Being open, "rather than answer 'yes' or 'no' "; that his "skepticism or disbelief in the existence of God" did "not necessarily mean lack of faith in anything whatsoever"; that his was a "belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed." R. 69–70, 73. He cited such personages as Plato, Aristotle and Spinoza for support of his ethical belief in intellectual and moral integrity "without belief in God, except in the remotest sense." R. 73. His belief was found to be sincere, hon-

est, and made in good faith; and his conscientious objection to be based upon individual training and belief, both of which included research in religious and cultural fields. Seeger's claim, however, was denied solely because it was not based upon a "belief in a relation to a Supreme Being" as required by § 6 (j) of the Act. At trial Seeger's counsel admitted that Seeger's belief was not in relation to a Supreme Being as commonly understood, but contended that he was entitled to the exemption because "under the present law Mr. Seeger's position would also include definitions of religion which have been stated more recently," R. 49, and could be "accommodated" under the definition of religious training and belief in the Act, R. 53. He was convicted and the Court of Appeals reversed, holding that the Supreme Being requirement of the section distinguished "between internally derived and externally compelled beliefs" and was, therefore, an "impermissible classification" under the Due Process Clause of the Fifth Amendment. 326 F. 2d 846.

No. 51: Jakobson was also convicted in the Southern District of New York on a charge of refusing to submit to induction. On his appeal the Court of Appeals reversed on the ground that rejection of his claim may have rested on the factual finding, erroneously made, that he did not believe in a Supreme Being as required by § 6 (j). 325 F. 2d 409.

Jakobson was originally classified 1–A in 1953 and intermittently enjoyed a student classification until 1956. It was not until April 1958 that he made claim to noncombatant classification (1–A–O) as a conscientious objector. He stated on the Selective Service System form that he believed in a "Supreme Being" who was "Creator of Man" in the sense of being "ultimately responsible for the existence of" man and who was "the Supreme Reality" of which "the existence of man is the *result.*" R. 44. (Emphasis in the original.) He explained that his reli-

gious and social thinking had developed after much meditation and thought. He had concluded that man must be "partly spiritual" and, therefore, "partly akin to the Supreme Reality"; and that his "most important religious law" was that "no man ought ever to wilfully sacrifice another man's life as a means to any other end . . . ." R. 45–46. In December 1958 he requested a 1–O classification since he felt that participation in any form of military service would involve him in "too many situations and relationships that would be a strain on [his] conscience that [he felt he] must avoid." R. 70. He submitted a long memorandum of "notes on religion" in which he defined religion as the *"sum and essence of one's basic attitudes to the fundamental problems of human existence,"* R. 72 (emphasis in the original); he said that he believed in "Godness" which was "the Ultimate Cause for the fact of the Being of the Universe"; that to deny its existence would but deny the existence of the universe because "anything that Is, has an Ultimate Cause for its Being." R. 73. There was a relationship to Godness, he stated, in two directions, *i. e.,* "vertically, towards Godness directly," and "horizontally, towards Godness through Mankind and the World." R. 74. He accepted the latter one. The Board classified him 1–A–O and Jakobson appealed. The hearing officer found that the claim was based upon a personal moral code and that he was not sincere in his claim. The Appeal Board classified him 1–A. It did not indicate upon what ground it based its decision, *i. e.,* insincerity or a conclusion that his belief was only a personal moral code. The Court of Appeals reversed, finding that his claim came within the requirements of § 6 (j). Because it could not determine whether the Appeal Board had found that Jakobson's beliefs failed to come within the statutory definition, or whether it had concluded that he lacked sincerity, it directed dismissal of the indictment.

No. 29: Forest Britt Peter was convicted in the Northern District of California on a charge of refusing to submit to induction. In his Selective Service System form he stated that he was not a member of a religious sect or organization; he failed to execute section VII of the questionnaire but attached to it a quotation expressing opposition to war, in which he stated that he concurred. In a later form he hedged the question as to his belief in a Supreme Being by saying that it depended on the definition and he appended a statement that he felt it a violation of his moral code to take human life and that he considered this belief superior to his obligation to the state. As to whether his conviction was religious, he quoted with approval Reverend John Haynes Holmes' definition of religion as "the consciousness of some power manifest in nature which helps man in the ordering of his life in harmony with its demands . . . [ ; it] is the supreme expression of human nature; it is man thinking his highest, feeling his deepest, and living his best." R. 27. The source of his conviction he attributed to reading and meditation "in our democratic American culture, with its values derived from the western religious and philosophical tradition." *Ibid.* As to his belief in a Supreme Being, Peter stated that he supposed "you could call that a belief in the Supreme Being or God. These just do not happen to be the words I use." R. 11. In 1959 he was classified 1–A, although there was no evidence in the record that he was not sincere in his beliefs. After his conviction for failure to report for induction the Court of Appeals, assuming *arguendo* that he was sincere, affirmed, 324 F. 2d 173.

### BACKGROUND OF § 6 (j).

Chief Justice Hughes, in his opinion in *United States v. Macintosh,* 283 U. S. 605 (1931), enunciated the rationale behind the long recognition of conscientious objec-

tion to participation in war accorded by Congress in our various conscription laws when he declared that "in the forum of conscience, duty to a moral power higher than the State has always been maintained." At 633 (dissenting opinion). In a similar vein Harlan Fiske Stone, later Chief Justice, drew from the Nation's past when he declared that

"both morals and sound policy require that the state should not violate the conscience of the individual. All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation at the hands of the state. So deep in its significance and vital, indeed, is it to the integrity of man's moral and spiritual nature that nothing short of the self-preservation of the state should warrant its violation; and it may well be questioned whether the state which preserves its life by a settled policy of violation of the conscience of the individual will not in fact ultimately lose it by the process." Stone, The Conscientious Objector, 21 Col. Univ. Q. 253, 269 (1919).

Governmental recognition of the moral dilemma posed for persons of certain religious faiths by the call to arms came early in the history of this country. Various methods of ameliorating their difficulty were adopted by the Colonies, and were later perpetuated in state statutes and constitutions. Thus by the time of the Civil War there existed a state pattern of exempting conscientious objectors on religious grounds. In the Federal Militia Act of 1862 control of conscription was left primarily in the States. However, General Order No. 99, issued by the Adjutant General pursuant to that Act, provided for striking from the conscription list those who were exempted by the States; it also established a commutation or substitution system fashioned from earlier state enactments. With the Federal Conscription Act of 1863,

which enacted the commutation and substitution provisions of General Order No. 99, the Federal Government occupied the field entirely, and in the 1864 Draft Act, 13 Stat. 9, it extended exemptions to those conscientious objectors who were members of religious denominations opposed to the bearing of arms and who were prohibited from doing so by the articles of faith of their denominations. Selective Service System Monograph No. 11, Conscientious Objection 40–41 (1950). In that same year the Confederacy exempted certain pacifist sects from military duty. *Id.*, at 46.

The need for conscription did not again arise until World War I. The Draft Act of 1917, 40 Stat. 76, 78, afforded exemptions to conscientious objectors who were affiliated with a "well-recognized religious sect or organization [then] organized and existing and whose existing creed or principles [forbade] its members to participate in war in any form . . . ." The Act required that all persons be inducted into the armed services, but allowed the conscientious objectors to perform noncombatant service in capacities designated by the President of the United States. Although the 1917 Act excused religious objectors only, in December 1917, the Secretary of War instructed that "personal scruples against war" be considered as constituting "conscientious objection." Selective Service System Monograph No. 11, Conscientious Objection 54–55 (1950). This Act, including its conscientious objector provisions, was upheld against constitutional attack in the *Selective Draft Law Cases*, 245 U. S. 366, 389–390 (1918).

In adopting the 1940 Selective Training and Service Act Congress broadened the exemption afforded in the 1917 Act by making it unnecessary to belong to a pacifist religious sect if the claimant's own opposition to war was based on "religious training and belief." 54 Stat. 889. Those found to be within the exemption were

not inducted into the armed services but were assigned
to noncombatant service under the supervision of the
Selective Service System. The Congress recognized that
one might be religious without belonging to an orga-
nized church just as surely as minority members of a
faith not opposed to war might through religious read-
ing reach a conviction against participation in war. Con-
gress Looks at the Conscientious Objector (National Serv-
ice Board for Religious Objectors, 1943) 71, 79, 83, 87,
88, 89. Indeed, the consensus of the witnesses appear-
ing before the congressional committees was that indi-
vidual belief—rather than membership in a church or
sect—determined the duties that God imposed upon
a person in his everyday conduct; and that "there is a
higher loyalty than loyalty to this country, loyalty to
God." *Id.*, at 29–31. See also the proposals which were
made to the House Military Affairs Committee but re-
jected. *Id.*, at 21–23, 82–83, 85. Thus, while shifting
the test from membership in such a church to one's indi-
vidual belief the Congress nevertheless continued its his-
toric practice of excusing from armed service those who
believed that they owed an obligation, superior to that
due the state, of not participating in war in any form.

Between 1940 and 1948 two courts of appeals [1] held
that the phrase "religious training and belief" did not
include philosophical, social or political policy. Then
in 1948 the Congress amended the language of the statute
and declared that "religious training and belief" was to
be defined as "an individual's belief in a relation to a
Supreme Being involving duties superior to those arising
from any human relation, but [not including] essentially
political, sociological, or philosophical views or a merely
personal moral code." The only significant mention of

---

[1] See *United States* v. *Kauten,* 133 F. 2d 703 (C. A. 2d Cir. 1943);
*Berman* v. *United States,* 156 F. 2d 377 (C. A. 9th Cir. 1946).

this change in the provision appears in the report of the Senate Armed Services Committee recommending adoption. It said simply this: "This section reenacts substantially the same provisions as were found in subsection 5 (g) of the 1940 act. Exemption extends to anyone who, because of religious training and belief in his relation to a Supreme Being, is conscientiously opposed to combatant military service or to both combatant and noncombatant military service. (See *United States* v. *Berman* [*sic*], 156 F. (2d) 377, certiorari denied, 329 U. S. 795.)" S. Rep. No. 1268, 80th Cong., 2d Sess., 14.

### INTERPRETATION OF § 6 (j).

1. The crux of the problem lies in the phrase "religious training and belief" which Congress has defined as "belief in a relation to a Supreme Being involving duties superior to those arising from any human relation." In assigning meaning to this statutory language we may narrow the inquiry by noting briefly those scruples expressly excepted from the definition. The section excludes those persons who, disavowing religious belief, decide on the basis of essentially political, sociological or economic considerations that war is wrong and that they will have no part of it. These judgments have historically been reserved for the Government, and in matters which can be said to fall within these areas the conviction of the individual has never been permitted to override that of the state. *United States* v. *Macintosh, supra* (dissenting opinion). The statute further excludes those whose opposition to war stems from a "merely personal moral code," a phrase to which we shall have occasion to turn later in discussing the application of § 6 (j) to these cases. We also pause to take note of what is not involved in this litigation. No party claims to be an atheist or attacks the statute on this ground. The question is not, therefore, one between theistic and atheistic beliefs. We do not deal with

or intimate any decision on that situation in these cases. Nor do the parties claim the monotheistic belief that there is but one God; what they claim (with the possible exception of Seeger who bases his position here not on factual but on purely constitutional grounds) is that they adhere to theism, which is the "Belief in the existence of a god or gods; . . . Belief in superhuman powers or spiritual agencies in one or many gods," as opposed to atheism.[2] Our question, therefore, is the narrow one: Does the term "Supreme Being" as used in § 6 (j) mean the orthodox God or the broader concept of a power or being, or a faith, "to which all else is subordinate or upon which all else is ultimately dependent"? Webster's New International Dictionary (Second Edition). In considering this question we resolve it solely in relation to the language of § 6 (j) and not otherwise.

2. Few would quarrel, we think, with the proposition that in no field of human endeavor has the tool of language proved so inadequate in the communication of ideas as it has in dealing with the fundamental questions of man's predicament in life, in death or in final judgment and retribution. This fact makes the task of discerning the intent of Congress in using the phrase "Supreme Being" a complex one. Nor is it made the easier by the richness and variety of spiritual life in our country. Over 250 sects inhabit our land. Some believe in a purely personal God, some in a supernatural deity; others think of religion as a way of life envisioning as its ultimate goal the day when all men can live together in perfect understanding and peace. There are those who think of God as the depth of our being; others, such as the Buddhists, strive for a state of lasting rest through self-denial and inner purification; in Hindu philosophy, the Supreme Being is

---

[2] See Webster's New International Dictionary (Second Edition); Webster's New Collegiate Dictionary (1949).

the transcendental reality which is truth, knowledge and bliss. Even those religious groups which have traditionally opposed war in every form have splintered into various denominations: from 1940 to 1947 there were four denominations using the name "Friends," Selective Service System Monograph No. 11, Conscientious Objection 13 (1950); the "Church of the Brethren" was the official name of the oldest and largest church body of four denominations composed of those commonly called Brethren, *id.*, at 11; and the "Mennonite Church" was the largest of 17 denominations, including the Amish and Hutterites, grouped as "Mennonite bodies" in the 1936 report on the Census of Religious Bodies, *id.*, at 9. This vast panoply of beliefs reveals the magnitude of the problem which faced the Congress when it set about providing an exemption from armed service. It also emphasizes the care that Congress realized was necessary in the fashioning of an exemption which would be in keeping with its long-established policy of not picking and choosing among religious beliefs.

In spite of the elusive nature of the inquiry, we are not without certain guidelines. In amending the 1940 Act, Congress adopted almost intact the language of Chief Justice Hughes in *United States* v. *Macintosh, supra:*

> "The essence of religion is belief in a relation to *God* involving duties superior to those arising from any human relation." At 633–634. (Emphasis supplied.)

By comparing the statutory definition with those words, however, it becomes readily apparent that the Congress deliberately broadened them by substituting the phrase "Supreme Being" for the appellation "God." And in so doing it is also significant that Congress did not elaborate on the form or nature of this higher authority which it chose to designate as "Supreme Being." By so refraining it must have had in mind the admonitions of the Chief

Justice when he said in the same opinion that even the word "God" had myriad meanings for men of faith:

> "[P]utting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty. The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field." At 634.

Moreover, the Senate Report on the bill specifically states that § 6 (j) was intended to re-enact "substantially the same provisions as were found" in the 1940 Act. That statute, of course, refers to "religious training and belief" without more. Admittedly, all of the parties here purport to base their objection on religious belief. It appears, therefore, that we need only look to this clear statement of congressional intent as set out in the report. Under the 1940 Act it was necessary only to have a conviction based upon religious training and belief; we believe that is all that is required here. Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. This construction avoids imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others, and is in accord with the well-established congressional policy of equal treatment for those whose opposition to service is grounded in their religious tenets.

3. The Government takes the position that since *Berman* v. *United States, supra,* was cited in the Senate Report on the 1948 Act, Congress must have desired to adopt the *Berman* interpretation of what constitutes "religious belief." Such a claim, however, will not bear scrutiny. First, we think it clear that an explicit statement of congressional intent deserves more weight than the parenthetical citation of a case which might stand for a number of things. Congress specifically stated that it intended to re-enact substantially the same provisions as were found in the 1940 Act. Moreover, the history of that Act reveals no evidence of a desire to restrict the concept of religious belief. On the contrary the Chairman of the House Military Affairs Committee which reported out the 1940 exemption provisions stated:

> "We heard the conscientious objectors and all of their representatives that we could possibly hear, and, summing it all up, their whole objection to the bill, aside from their objection to compulsory military training, was based upon the right of conscientious objection and in most instances to the right of the ministerial students to continue in their studies, and we have provided ample protection for those classes and those groups." 86 Cong. Rec. 11368 (1940).

During the House debate on the bill, Mr. Faddis of Pennsylvania made the following statement:

> "We have made provision to take care of conscientious objectors. I am sure the committee has had all the sympathy in the world with those who appeared claiming to have religious scruples against rendering military service in its various degrees. Some appeared who had conscientious scruples against handling lethal weapons, but who had no

scruples against performing other duties which did not actually bring them into combat. Others appeared who claimed to have conscientious scruples against participating in any of the activities that would go along with the Army. The committee took all of these into consideration and has written a bill which, I believe, will take care of all the reasonable objections of this class of people." 86 Cong. Rec. 11418 (1940).

Thus the history of the Act belies the notion that it was to be restrictive in application and available only to those believing in a traditional God.

As for the citation to *Berman*, it might mean a number of things. But we think that Congress' action in citing it must be construed in such a way as to make it consistent with its express statement that it meant substantially to re-enact the 1940 provision. As far as we can find, there is not one word to indicate congressional concern over any conflict between *Kauten* and *Berman*. Surely, if it thought that two clashing interpretations as to what amounted to "religious belief" had to be resolved, it would have said so somewhere in its deliberations. Thus, we think that rather than citing *Berman* for what it said "religious belief" was, Congress cited it for what it said "religious belief" was not. For both *Kauten* and *Berman* hold in common the conclusion that exemption must be denied to those whose beliefs are political, social or philosophical in nature, rather than religious. Both, in fact, denied exemption on that very ground. It seems more likely, therefore, that it was this point which led Congress to cite *Berman*. The first part of the § 6 (j) definition—belief in a relation to a Supreme Being—was indeed set out in *Berman*, with the exception that the court used the word "God" rather than "Supreme Being." However, as the Government recognizes, *Berman* took that language word for word from *Macintosh*. Far from

requiring a conclusion contrary to the one we reach here, Chief Justice Hughes' opinion, as we have pointed out, supports our interpretation.

Admittedly, the second half of the statutory definition—the rejection of sociological and moral views—was taken directly from *Berman*. But, as we have noted, this same view was adhered to in *United States* v. *Kauten, supra*. Indeed the Selective Service System has stated its view of the cases' significance in these terms: "The *United States* v. *Kauten* and *Herman Berman* v. *United States* cases ruled that a valid conscientious objector claim to exemption must be based solely on 'religious training and belief' and not on philosophical, political, social, or other grounds . . . ." Selective Service System Monograph No. 11, Conscientious Objection 337 (1950). See *id.*, at 278. That the conclusions of the Selective Service System are not to be taken lightly is evidenced in this statement by Senator Gurney, Chairman of the Senate Armed Services Committee and sponsor of the Senate bill containing the present version of § 6 (j):

> "The bill which is now pending follows the 1940 act, with very few technical amendments, worked out by those in Selective Service who had charge of the conscientious-objector problem during the war." 94 Cong. Rec. 7305 (1948).

Thus we conclude that in enacting § 6 (j) Congress simply made explicit what the courts of appeals had correctly found implicit in the 1940 Act. Moreover, it is perfectly reasonable that Congress should have selected *Berman* for its citation, since this Court denied certiorari in that case, a circumstance not present in *Kauten*.

Section 6 (j), then, is no more than a clarification of the 1940 provision involving only certain "technical amendments," to use the words of Senator Gurney. As such it continues the congressional policy of providing exemption from military service for those whose opposition

is based on grounds that can fairly be said to be "religious." [3]  To hold otherwise would not only fly in the face of Congress' entire action in the past; it would ignore the historic position of our country on this issue since its founding.

4. Moreover, we believe this construction embraces the ever-broadening understanding of the modern religious community.  The eminent Protestant theologian, Dr. Paul Tillich, whose views the Government concedes would come within the statute, identifies God not as a projection "out there" or beyond the skies but as the ground of our very being.  The Court of Appeals stated in No. 51 that Jakobson's views "parallel [those of] this eminent theologian rather strikingly."  325 F. 2d, at 415–416.  In his book, Systematic Theology, Dr. Tillich says:

> "I have written of the God above the God of theism . . . .  In such a state [of self-affirmation] the God of both religious and theological language disappears.  But something remains, namely, the seriousness of that doubt in which meaning within meaninglessness is affirmed.  The source of this affirmation of meaning within meaninglessness, of certitude within doubt, is not the God of traditional theism but the 'God above God,' the power of being, which works through those who have no name for it, not even the name God."  II Systematic Theology 12 (1957).

---

[3] A definition of "religious training and belief" identical to that in § 6 (j) is found in § 337 of the Immigration and Nationality Act, 66 Stat. 258, 8 U. S. C. § 1448 (a) (1958 ed.).  It is noteworthy that in connection with this Act, the Senate Special Subcommittee to Investigate Immigration and Naturalization stated: "The subcommittee realizes and respects the fact that the question of whether or not a person must bear arms in defense of his country may be one which invades the province of religion and personal conscience."  Thus, it recommended that an alien not be required to vow to bear arms when he asserted "his opposition to participation in war in any form because of his personal religious training and belief."  S. Rep. No. 1515, 81st Cong., 2d Sess., 742, 746.

Another eminent cleric, the Bishop of Woolwich, John A. T. Robinson, in his book, Honest To God (1963), states:

> "The Bible speaks of a God 'up there.' No doubt its picture of a three-decker universe, of 'the heaven above, the earth beneath and the waters under the earth,' was once taken quite literally. . . ." At 11.
>
> "[Later] *in place of a God who is literally or physically 'up there' we have accepted, as part of our mental furniture, a God who is spiritually or metaphysically 'out there.'* . . . But now it seems there is no room for him, not merely in the inn, but in the entire universe: for there are no vacant places left. In reality, of course, our new view of the universe has made not the slightest difference. . . ." At 13–14.
>
> "But the idea of a God spiritually or metaphysically 'out there' dies very much harder. Indeed, most people would be seriously disturbed by the thought that it should need to die at all. For it *is* their God, and they have nothing to put in its place. . . . Every one of us lives with some mental picture of a God 'out there,' a God who 'exists' above and beyond the world he made, a God 'to' whom we pray and to whom we 'go' when we die." At 14.
>
> "But the signs are that we are reaching the point at which the whole conception of a God 'out there,' which has served us so well since the collapse of the three-decker universe, is itself becoming more of a hindrance than a help." At 15–16. (Emphasis in original.)

The Schema of the recent Ecumenical Council included a most significant declaration on religion: [4]

---

[4] Draft declaration on the Church's relations with non-Christians, Council Daybook, Vatican II, 3d Sess., p. 282, N. C. W. C., Washington, D. C., 1965.

"The community of all peoples is one. One is their origin, for God made the entire human race live on all the face of the earth. One, too, is their ultimate end, God. Men expect from the various religions answers to the riddles of the human condition: What is man? What is the meaning and purpose of our lives? What is the moral good and what is sin? What are death, judgment, and retribution after death?

. . . . .

"Ever since primordial days, numerous peoples have had a certain perception of that hidden power which hovers over the course of things and over the events that make up the lives of men; some have even come to know of a Supreme Being and Father. Religions in an advanced culture have been able to use more refined concepts and a more developed language in their struggle for an answer to man's religious questions.

. . . . .

"Nothing that is true and holy in these religions is scorned by the Catholic Church. Ceaselessly the Church proclaims Christ, 'the Way, the Truth, and the Life,' in whom God reconciled all things to Himself. The Church regards with sincere reverence those ways of action and of life, precepts and teachings which, although they differ from the ones she sets forth, reflect nonetheless a ray of that Truth which enlightens all men."

Dr. David Saville Muzzey, a leader in the Ethical Culture Movement, states in his book, Ethics As a Religion (1951), that "[e]verybody except the avowed atheists (and they are comparatively few) believes in some kind of God," and that "The proper question to ask, therefore, is

not the futile one, Do you believe in God? but rather, What *kind* of God do you believe in?" *Id.*, at 86–87. Dr. Muzzey attempts to answer that question:

"Instead of positing a personal God, whose existence man can neither prove nor disprove, the ethical concept is founded on human experience. It is anthropocentric, not theocentric. Religion, for all the various definitions that have been given of it, must surely mean the devotion of man to the highest ideal that he can conceive. And that ideal is a community of spirits in which the latent moral potentialities of men shall have been elicited by their reciprocal endeavors to cultivate the best in their fellow men. What ultimate reality is we do not know; but we have the faith that it expresses itself in the human world as the power which inspires in men moral purpose." At 95.

"Thus the 'God' that we love is not the figure on the great white throne, but the perfect pattern, envisioned by faith, of humanity as it should be, purged of the evil elements which retard its progress toward 'the knowledge, love and practice of the right.' " At 98.

These are but a few of the views that comprise the broad spectrum of religious beliefs found among us. But they demonstrate very clearly the diverse manners in which beliefs, equally paramount in the lives of their possessors, may be articulated. They further reveal the difficulties inherent in placing too narrow a construction on the provisions of § 6 (j) and thereby lend conclusive support to the construction which we today find that Congress intended.

5. We recognize the difficulties that have always faced the trier of fact in these cases. We hope that the test that we lay down proves less onerous. The examiner is fur-

nished a standard that permits consideration of criteria with which he has had considerable experience. While the applicant's words may differ, the test is simple of application. It is essentially an objective one, namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?

Moreover, it must be remembered that in resolving these exemption problems one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight. Recognition of this was implicit in this language, cited by the *Berman* court from *State* v. *Amana Society,* 132 Iowa 304, 109 N. W. 894 (1906):

> "Surely a scheme of life designed to obviate [man's inhumanity to man], and by removing temptations, and all the allurements of ambition and avarice, to nurture the virtues of unselfishness, patience, love, and service, ought not to be denounced as not pertaining to religion *when its devotees regard it as an essential tenet of their religious faith.*" 132 Iowa, at 315, 109 N. W., at 898, cited in *Berman* v. *United States,* 156 F. 2d 377, 381. (Emphasis by the Court of Appeals.)

The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's "Supreme Being" or the truth of his concepts. But these are inquiries foreclosed to Government. As MR. JUSTICE DOUGLAS stated in *United States* v. *Ballard,* 322 U. S. 78, 86 (1944): "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." Local

boards and courts in this sense are not free to reject beliefs because they consider them "incomprehensible." Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.

But we hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector. The Act provides a comprehensive scheme for assisting the Appeal Boards in making this determination, placing at their service the facilities of the Department of Justice, including the Federal Bureau of Investigation and hearing officers. Finally, we would point out that in *Estep* v. *United States,* 327 U. S. 114 (1946), this Court held that:

> "The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant." At 122–123.

APPLICATION OF § 6 (j) TO THE INSTANT CASES.

As we noted earlier, the statutory definition excepts those registrants whose beliefs are based on a "merely personal moral code." The records in these cases, how-

ever, show that at no time did any one of the applicants suggest that his objection was based on a "merely personal moral code." Indeed at the outset each of them claimed in his application that his objection was based on a religious belief. We have construed the statutory definition broadly and it follows that any exception to it must be interpreted narrowly. The use by Congress of the words "merely personal" seems to us to restrict the exception to a moral code which is not only personal but which is the sole basis for the registrant's belief and is in no way related to a Supreme Being. It follows, therefore, that if the claimed religious beliefs of the respective registrants in these cases meet the test that we lay down then their objections cannot be based on a "merely personal" moral code.

In *Seeger*, No. 50, the Court of Appeals failed to find sufficient "externally compelled beliefs." However, it did find that "it would seem impossible to say with assurance that [Seeger] is not bowing to 'external commands' in virtually the same sense as is the objector who defers to the will of a supernatural power." 326 F. 2d, at 853. It found little distinction between Jakobson's devotion to a mystical force of "Godness" and Seeger's compulsion to "goodness." Of course, as we have said, the statute does not distinguish between externally and internally derived beliefs. Such a determination would, as the Court of Appeals observed, prove impossible as a practical matter, and we have found that Congress intended no such distinction.

The Court of Appeals also found that there was no question of the applicant's sincerity. He was a product of a devout Roman Catholic home; he was a close student of Quaker beliefs from which he said "much of [his] thought is derived"; he approved of their opposition to war in any form; he devoted his spare hours to the Amer-

ican Friends Service Committee and was assigned to hospital duty.

In summary, Seeger professed "religious belief" and "religious faith." He did not disavow any belief "in a relation to a Supreme Being"; indeed he stated that "the cosmic order does, perhaps, suggest a creative intelligence." He decried the tremendous "spiritual" price man must pay for his willingness to destroy human life. In light of his beliefs and the unquestioned sincerity with which he held them, we think the Board, had it applied the test we propose today, would have granted him the exemption. We think it clear that the beliefs which prompted his objection occupy the same place in his life as the belief in a traditional deity holds in the lives of his friends, the Quakers. We are reminded once more of Dr. Tillich's thoughts:

> "And if that word [God] has not much meaning for you, translate it, and speak of the depths of your life, of the source of your being, of your ultimate concern, *of what you take seriously without any reservation.* Perhaps, in order to do so, you must forget everything traditional that you have learned about God . . . ." Tillich, The Shaking of the Foundations 57 (1948). (Emphasis supplied.)

It may be that Seeger did not clearly demonstrate what his beliefs were with regard to the usual understanding of the term "Supreme Being." But as we have said Congress did not intend that to be the test. We therefore affirm the judgment in No. 50.

In *Jakobson*, No. 51, the Court of Appeals found that the registrant demonstrated that his belief as to opposition to war was related to a Supreme Being. We agree and affirm that judgment.

We reach a like conclusion in No. 29. It will be remembered that Peter acknowledged "some power manifest in

nature . . . the supreme expression" that helps man in ordering his life. As to whether he would call that belief in a Supreme Being, he replied, "you could call that a belief in the Supreme Being or God. These just do not happen to be the words I use." We think that under the test we establish here the Board would grant the exemption to Peter and we therefore reverse the judgment in No. 29.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

If I read the statute differently from the Court, I would have difficulties. For then those who embraced one religious faith rather than another would be subject to penalties; and that kind of discrimination, as we held in *Sherbert* v. *Verner,* 374 U. S. 398, would violate the Free Exercise Clause of the First Amendment. It would also result in a denial of equal protection by preferring some religions over others—an invidious discrimination that would run afoul of the Due Process Clause of the Fifth Amendment. See *Bolling* v. *Sharpe,* 347 U. S. 497.

The legislative history of this Act leaves much in the dark. But it is, in my opinion, not a *tour de force* if we construe the words "Supreme Being" to include the cosmos, as well as an anthropomorphic entity. If it is a *tour de force* so to hold, it is no more so than other instances where we have gone to extremes to construe an Act of Congress to save it from demise on constitutional grounds. In a more extreme case than the present one we said that the words of a statute may be strained "in the candid service of avoiding a serious constitutional doubt." *United States* v. *Rumely,* 345 U. S. 41, 47.[1]

---

[1] And see *Crowell* v. *Benson,* 285 U. S. 22, 62; *Ullmann* v. *United States,* 350 U. S. 422, 433; *Ashwander* v. *TVA,* 297 U. S. 288, 341, 348 (concurring opinion).

The words "a Supreme Being" have no narrow technical meaning in the field of religion. Long before the birth of our Judeo-Christian. civilization the idea of God had taken hold in many forms. Mention of only two— Hinduism and Buddhism—illustrates the fluidity and evanescent scope of the concept. In the Hindu *religion* the Supreme Being is conceived in the forms of several cult Deities. The chief of these, which stand for the Hindu Triad, are Brahma, Vishnu and Siva. Another Deity, and the one most widely worshipped, is Sakti, the Mother Goddess, conceived as power, both destructive and creative. Though Hindu religion encompasses the worship of many Deities, it believes in only one single God, the eternally existent One Being with his manifold attributes and manifestations. This idea is expressed in Rigveda, the earliest sacred text of the Hindus, in verse 46 of a hymn attributed to the mythical seer Dirghatamas (Rigveda, I, 164):

> "They call it Indra, Mitra, Varuna and Agni
> And also heavenly beautiful Garutman:
> The Real is One, though sages name it variously—
> They call it Agni, Yama, Matarisvan."

See Smart, Reasons and Faiths, p. 35, n. 1 (1958); 32 Harvard Oriental Series, pp. 434–435 (Lanman ed. 1925). See generally 31 and 32 *id.;* Editors of Life Magazine, The World's Great Religions, Vol. 1, pp. 17–48 (1963).

Indian *philosophy,* which comprises several schools of thought, has advanced different theories of the nature of the Supreme Being. According to the Upanisads, Hindu sacred texts, the Supreme Being is described as the power which creates and sustains everything, and to which the created things return upon dissolution. The word which is commonly used in the Upanisads to indicate the Supreme Being is Brahman. Philosophically, the

Supreme Being is the transcendental Reality which is Truth, Knowledge, and Bliss. It is the source of the entire universe. In this aspect Brahman is Isvara, a personal Lord and Creator of the universe, an object of worship. But, in the view of one school of thought, that of Sankara, even this is an imperfect and limited conception of Brahman which must be transcended: to think of Brahman as the Creator of the material world is necessarily to form a concept infected with illusion, or *maya*—which is what the world really is, in highest truth. Ultimately, mystically, Brahman must be understood as without attributes, as *neti neti* (not this, not that). See Smart, *op. cit., supra*, p. 133.

Buddhism—whose advent marked the reform of Hinduism—continued somewhat the same concept. As stated by Nancy Wilson Ross, "God—if I may borrow that word for a moment—the universe, and man are one indissoluble existence, one total whole. Only THIS—capital THIS—is. Anything and everything that appears to us as an individual entity or phenomenon, whether it be a planet or an atom, a mouse or a man, is but a temporary manifestation of THIS in form; every activity that takes place, whether it be birth or death, loving or eating breakfast, is but a temporary manifestation of THIS in activity. When we look at things this way, naturally we cannot believe that each individual person has been endowed with a special and individual soul or self. Each one of us is but a cell, as it were, in the body of the Great Self, a cell that comes into being, performs its functions, and passes away, transformed into another manifestation. Though we have temporary individuality, that temporary, limited individuality is not either a true self or our true self. Our true self is the Great Self; our true body is the Body of Reality, or the Dharmakaya, to give it its technical Buddhist name." The World of Zen, p. 18 (1960).

Does a Buddhist believe in "God" or a "Supreme Be-ing"?   That, of course, depends on how one defines "God," as one eminent student of Buddhism has explained:

> "It has often been suggested that Buddhism is an atheistic system of thought, and this assumption has given rise to quite a number of discussions.   Some have claimed that since Buddhism knew no God, it could not be a religion; others that since Buddhism obviously was a religion which knew no God, the belief in God was not essential to religion.   These discussions assume that *God* is an unambiguous term, which is by no means the case."   Conze, Buddhism, pp. 38–39 (1959).

Dr. Conze then says that if "God" is taken to mean a per-sonal Creator of the universe, then the Buddhist has no interest in the concept.   *Id.*, p. 39.   But if "God" means something like the state of oneness with God as described by some Christian mystics, then the Buddhist surely be-lieves in "God," since this state is almost indistinguish-able from the Buddhist concept of Nirvana, "the supreme Reality; . . . the eternal, hidden and incomprehensible Peace."   *Id.*, pp. 39–40.   And finally, if "God" means one of the many Deities in an at least superficially polytheistic religion like Hinduism, then Buddhism tolerates a belief in many Gods: "the Buddhists believe that a Faith can be kept alive only if it can be adapted to the mental habits of the average person.   In consequence, we find that, in the earlier Scriptures, the deities of Brahmanism are taken for granted and that, later on, the Buddhists adopted the local Gods of any district to which they came."   *Id.*, p. 42.

When the present Act was adopted in 1948 we were a nation of Buddhists, Confucianists, and Taoists, as well as Christians.   Hawaii, then a Territory, was indeed filled with Buddhists, Buddhism being "probably the major

faith, if Protestantism and Roman Catholicism are deemed different faiths." Stokes and Pfeffer, Church and State in the United States, p. 560 (1964). Organized Buddhism first came to Hawaii in 1887 when Japanese laborers were brought to work on the plantations. There are now numerous Buddhist sects in Hawaii, and the temple of the Shin sect in Honolulu is said to have the largest congregation of any religious organization in the city. See Mulholland, Religion in Hawaii, pp. 44–50 (1961).

In the continental United States Buddhism is found "in real strength" in Utah, Arizona, Washington, Oregon, and California. "Most of the Buddhists in the United States are Japanese or Japanese-Americans; however, there are 'English' departments in San Francisco, Los Angeles, and Tacoma." Mead, Handbook of Denominations, p. 61 (1961). The Buddhist Churches of North America, organized in 1914 as the Buddhist Mission of North America and incorporated under the present name in 1942, represent the Jodo Shinshu Sect of Buddhism in this country. This sect is the only Buddhist group reporting information to the annual Yearbook of American Churches. In 1961, the latest year for which figures are available, this group alone had 55 churches and an inclusive membership of 60,000; it maintained 89 church schools with a total enrollment of 11,150. Yearbook of American Churches, p. 30 (1965). According to one source, the total number of Buddhists of all sects in North America is 171,000. See World Almanac, p. 636 (1965).

When the Congress spoke in the vague general terms of a Supreme Being I cannot, therefore, assume that it was so parochial as to use the words in the narrow sense urged on us. I would attribute tolerance and sophistication to the Congress, commensurate with the religious complexion of our communities. In sum, I agree with the Court that any person opposed to war on the basis of a sincere belief, which in his life fills the same place as a be-

lief in God fills in the life of an orthodox religionist, is entitled to exemption under the statute. None comes to us an avowedly irreligious person or as an atheist; [2] one, as a sincere believer in "goodness and virtue for their own sakes." His questions and doubts on theological issues, and his wonder, are no more alien to the statutory standard than are the awe-inspired questions of a devout Buddhist.

---

[2] If he were an atheist, quite different problems would be presented. Cf. *Torcaso* v. *Watkins*, 367 U. S. 488.