Lynda Dianne **REISER**

v.

**Michael P.W. STONE, etc., et al.**

**No. 91–7545.**

United States District Court, E.D. Pennsylvania.

May 7, 1992.

---

James H. Feldman, Jr. (argued) Peter Goldberger, Philadelphia, Pa., for petitioners.

Major Diana Moore, U.S. Army Litigation Ct., Washington, D.C., Debra L.W. Cohn, Asst. U.S. Atty., Philadelphia, Pa., for respondent.

BENCH OPINION [*]

LOUIS H. POLLAK, Senior District Judge.

Dr. Reiser has filed an application for habeas corpus seeking release from mili-

---

[*] This bench opinion, issued on February 18, 1992, has been edited by the writer very slightly to improve intelligibility.

tary service. She is a lieutenant in the Army Reserve and, at the moment, is under orders to report for duty as a physician in the Army next month.

At the time of filing of the application for habeas corpus, it was contemplated that Dr. Reiser would be required to report at a date earlier than this; however, to permit a careful examination of the case, unpressured by deadlines of time, the Army has cooperated in postponing Dr. Reiser's time of reporting. For that cooperation, I am most grateful.

The essential chronological background of this case is that Dr. Reiser, as an undergraduate in college, was an ROTC student. Graduating from Washington and Jefferson in 1986, she had conferred upon her, and accepted, the Reserve commission as a second lieutenant that was contemplated as sequential on her completion of college and the attendant ROTC program. The terms of her military obligation were that she owed the Army four years of service.

The petitioner sought a deferment to attend medical school, and that deferment was granted, and the petitioner has attended Temple University Medical School, completing her work there in 1990. It is my understanding that by undertaking to study medicine, the applicant, while continuing to have an obligation of active duty to the military, reduced that obligation from four years to three years.

As graduation from medical school approached, in January of 1990, the applicant sought and received a deferment, a further deferment of her active duty obligation, so that she might initiate an internship. The deferment granted was for only one year, a shorter time than the applicant had sought. And, indeed, the applicant was advised that she could count on being called to active duty somewhere after July of 1991. Dr. Reiser went forward with the internship and in the course of the internship made arrangements to initiate, at the close of the internship year, a three-year fellowship in anesthesiology, her chosen specialty. She is in that status at this time.

In August of 1990, Dr. Reiser advised the Army that she intended to seek classification as a conscientious objector and resultant discharge. Pursuant to AR 600-43, a formal application to that effect was made in November of 1990. In September 1991, the Department of the Army Conscientious Objector Review Board denied Dr. Reiser's application, notwithstanding that the chaplain who had been assigned to interview Dr. Reiser, Colonel Ronald D. Miller, and the investigating officer who had also been assigned to interview Dr. Reiser, Lieutenant Colonel Charles Nester, both concluded that Dr. Reiser's application for classification as a conscientious objector was sincere. Colonel Nester entered a decision as called for by the governing regulations that recommended, "The First Lieutenant Linda D. Reiser, 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, be awarded classification as a conscientious objector (1-0), who by reason of conscientious objection sincerely objects to participation of any kind of war in any form."

The decision, adverse to Dr. Reiser, of the Conscientious Objector Review Board, Department of the Army, which bears the acronym DACORB, is a decision which is subject to judicial review, but to very limited judicial review indeed. The review is on the record made before DACORB, and it is essentially confined to the question whether the decision of the Board is supportable in fact, in light of the factual record made before the Board.

To say supportable in fact, of course, implies the application to a factual record of certain legal principles. In the case of establishing status as a conscientious objector, the governing legal principles are relatively clear.

In *Shaffer v. Schlesinger*, 531 F.2d 124, 127–128 (3d Cir.1976), the Third Circuit said:

\*     \*     \*     \*     \*     \*

"To qualify for a discharge from the armed forces as a conscientious objector, an applicant must establish that he is opposed to participation to war in any form; that his opposition to war is rooted in "religious training and beliefs" as defined in *Welsh v. United States*, 398 U.S. 333 [90 S.Ct. 1792, 26 L.Ed.2d 308] (1970) and in *United States v. Seeger*, 380 U.S. 163 [85 S.Ct. 850, 13 L.Ed.2d 733] (1965); that his beliefs are sincerely held; and that his beliefs did not become fixed until after entry into service."

The standard of belief referred to by the Court in *Shaffer*, as explicated in *Welsh* and *Seeger*, incorporates what the Supreme Court said in *Welsh*, discussing its own previous holding in *Seeger:*

The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. 380 U.S. [at] 176 [85 S.Ct. at 859].

The Court made it clear that these sincere and meaningful beliefs that prompt the registrant's objection to all wars need not be confined in either source or content to traditional or parochial concepts of religion. It held that § 6(j) "does not distinguish between externally and internally derived beliefs," *id.*, at 186 [85 S.Ct. at 864], and also held that "intensely personal" convictions which some might find "incomprehensible" or "incorrect" come within the meaning of "religious belief" in the Act. *Id.*, at 184–185 [85 S.Ct. at 863–864]. What is necessary under *Seeger* for a registrant's conscientious objection to all war to be "religious" within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong, and that these beliefs be held with the strength of traditional religious convictions.

That language of Justice Black, which was construing the Selective Service Act, has been taken into the standard which, by regulation, the Department of Defense and its constituent service agencies have adopted to test claims, such as that of Dr. Reiser, for release from military service on grounds of conscientious objection.

The decision of DACORB to deny Dr. Reiser's application for conscientious objector status does not appear to rest in any part on doubt that the views expressed by Dr. Reiser constitute views which are of a moral and ethical weight, and which are, for the purposes of this inquiry, as strong and consequential as religious views of a conventional sort. I make that point, because on argument this morning some attention was given to the question whether, in the view of the chaplain who interviewed Dr. Reiser, he felt her views to be philosophical rather than moral or ethical. The issue as a factual matter evaporated, given that other portions of the chaplain's interview report spoke of Dr. Reiser's views as being moral as well as philosophical; a moral and philosophical opposition to violence. Were the issue of consequence for current purposes, it is my clear view that the governing regulation does not proscribe a tenet because it may be characterizable as a philosophic tenet. The regulation talks about moral and ethical convictions. See, for example, Section 1–7(5)(b). It seems apparent that both moral and ethical propositions have a place in the universe of philosophy.

At all events, as I say, the issue evaporates as a factual matter because it appears that, read comprehensively, the chaplain's interview report does not draw a distinction between a philosophic view held by Dr. Reiser, and a moral view or an ethical view not held by her.

More to the point, the Board's determination—and it is that that is here before us for review—does not evidence any quarrel with the characterization by Dr. Reiser of her views about opposition to war in any form as being views that are cognate with

religious views, albeit, Dr. Reiser, at this time, is not a member of a church, and does not subscribe to formal religious beliefs or direction in formulating her views about war.

The grounds given by DACORB for denying Dr. Reiser's application are set forth in three paragraphs, each of which goes to the sincerity of Dr. Reiser's convictions. Following the statement of those three paragraphs, to which I will refer further, the Board announced that it "has determined that First Lieutenant Reiser has failed to establish, by clear and convincing evidence, that her stated beliefs are sincerely held."

In the following paragraph, you get Board action disapproval. The first factor considered by the Board in concluding that the Board was not persuaded that Dr. Reiser's convictions are sincerely held had to do with "whether the asserted convictions were formulated by rigorous training, study, contemplation, or other similar processes that are compatible to the rigorous means by which traditional religious convictions are formulated." The Board was there addressing what AR 600–43, paragraph 17(5)(b), classifies as a "relevant factor" in an examination into whether convictions are sincere. The paragraph states, "Relevant factors that should be considered in determining a person's claim of conscientious objection include training in the home and church; general demeanor and pattern of conduct; participation in religious activities; whether ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated; credibility of persons supporting the claim."

DACORB notes that Dr. Reiser is not a church member. They note that Dr. Reiser:

... states that her beliefs as a conscientious objector developed progressively over the past seven years, beginning from her initial training during ROTC in college. She also states that although her feelings about not wanting to serve

in the military were strong since her participation in ROTC summer camp in 1985, her feelings did not become fixed in terms of conscientious objection until April 1990, five years later and one month prior to her graduation from medical school.

She further states that the book "Slaughterhouse Five" by Kurt Vonnegut, and the movie, "Born On The Fourth of July" helped her to put into perspective the military principles of war and were particularly influential to her decision to seek separation from the Army.

First Lieutenant Reiser also states that her beliefs were strengthened during her fourth year of medical school by her two roommates who were also fourth year medical students owing military obligations for medical school scholarships they had received and who were also applying for conscientious objector status."

Having made this recital, the Board goes on to say:

This application does not demonstrate, by clear and convincing evidence, a development of convictions methodology that is comparable to the rigorous means by which traditional religious convictions are formulated. This absence of a rigorous method in formulating her asserted convictions, coupled with the factors discussed below, did not convince the DACORB that her stated convictions are sincerely held.

The Board's recital contrasts with the chaplain's observation:

The initial source of her belief began to surface during her exposure to combat military training, and grew into her deepening sense that to wear a military uniform would in essence make her an unwilling participant in violence and destruction toward other human beings. Her repugnance for violence was increased as a result of being exposed to victims of it during her medical training in urban Philadelphia.

The Board's recital also contrasts with the description by the investigating officer, Colonel Nester:

The applicant testified that she pursued an Army ROTC scholarship to ease the financial burden on her parents. She cannot view the military as a peace-keeping force. The crystallization of her moral beliefs occurred in part through the assistance of her roommates who discussed principles and values and supported her objectives.

An essential component of the crystallization process occurred at Temple University Hospital in her third year of medical school when she assisted in treating a sixteen-year old shooting victim who died despite medical efforts. First Lieutenant Reiser experienced nightmares and avoided movies and television shows depicting violent themes. The applicant stated that when she entered ROTC, she had strong moral beliefs, but not rising to the level of conscientious objector status. She viewed her role as passive, and that because she knew should would serve as a physician, First Lieutenant Reiser did not feel that she would be directly involved.

The beliefs of the applicant did not change, but became stronger and more fixed. These beliefs became fixed in stages, becoming more pronounced during the third and fourth years of medical school where working in the hospital exposed her to actual life and death situations.

In April 1990, the applicant's beliefs became crystallized and she sought counseling of James Crichton, Friends Military Counseling. When posed the following hypothetical situation—assume that your application for conscientious discharge is recommended disapproval, what would you do—the applicant indicated she would be very disappointed and would appeal the decision. If all appeals were exhausted, the applicant would refuse to serve even in a non-combat role because such service would be a compromise of values and beliefs.

The investigating officer goes on to describe the supporting testimony of one of the applicant's friends, Dr. Amy Simmons, who attests to the nature of their conversations as medical roommates. Dr. Simmons herself was going through the same process of thinking her way through to an understanding of her own beliefs with respect to war and military service.

There is further explanation of the applicant's conviction that she could not perform non-combatant service. She "did indicate, in response to a question of the investigating officer, that she would have to give some thought to the prospect of service in an alternative capacity at a Veterans Hospital or in the Public Health Corps, if such an opportunity existed. Concerning repayment of the cost of her medical education, the applicant indicated that she is aware that a mechanism exists for collection, and that she intends to repay the money regardless of the length of time that it takes."

Returning to DACORB's statement, "This application does not demonstrate, by clear and convincing evidence, a development of convictions methodology that is comparable to the rigorous means by which traditional religious convictions are formulated." The Board states summarily its view, but offers no articulation as to what it is in the factual record that falls short of making the demonstration that the Board feels is called for.

The Board's statement, without more, certainly without any anchorage in particular facts, which, in the Board's view, cut against the applicant's characterizations of the way in which she reached her views, cannot, in my judgment, by itself, be regarded as having any weight.

Now, to be sure, the Board states, in concluding that section of its memorandum opinion, that: "This absence of a rigorous method in formulating her asserted convictions, coupled with the factors discussed below, did not convince the DACORB that her stated convictions are sincerely held." So, clearly, we must turn to the factors discussed below.

The second factor to which the Board refers is this: "A conscientious objector is one whose conscience allows her no rest or inner peace if she is required to fulfill her military obligation. (Paragraph D–4b, AR

600–43). First Lieutenant Reiser claims to have had strong misgivings concerning her military commitment since 1985. While First Lieutenant Reiser now asserts that she cannot in good conscience be a part of the U.S. Army, she has served as an ROTC scholarship student from 1983–1986, and been a member of the Army Reserve from 1986–1990, with the benefits that accrue, and did not seek release. This does not demonstrate a 'lack of rest or inner peace' to DACORB."

DACORB's reference to "lack of rest or inner peace" is rooted in, as DACORB said, paragraph D–4b of AR 600–43. That is a reference to an appendix to the legislation, which is characterized, "Informal Guide for the Investigating Officer." The Guide says *inter alia:* "During the conduct of the entire investigation, the investigating officer should remember that (b) an applicant's sincere desire to get out of the Army, his or her unit or job, is not conscientious objection. Likewise, an applicant's belief that he or she is called to another occupation, even a religious one, is not, underscored, conscientious objection if he or she merely prefers a different life. A conscientious objector is one whose conscience, because of (a) above—" (a) being a reference to "deeply held moral or ethical (not political, philosophical, or sociological) beliefs"—"allows him or her no rest or inner peace if he or she is required to fulfill the present military obligation."

I have asked questions in the course of argument this morning as to the status of Appendix D, whether it is to be regarded as a part of AR 600–43. It is the position of the Army that it is. There is no doubt that it is formally annexed to what I would say are the formal provisions proper.

The discussion arose this morning because I was puzzled about the language which contrasted in D–4(a), "deeply held moral or ethical (not political, philosophical, or sociological) beliefs," a contradistinction which I did not fully comprehend for reasons that I've outlined already. "Philosophical" seemed to me a word which could readily embrace, certainly overlap with, "moral" or "ethical." And the semantic contradistinction was not to be found in the formal provisions of the regulation, most especially paragraph 1.17, and indeed in the overarching Defense Department regulation, pursuant to which this Army regulation has been adopted.

But putting aside that inquiry, which, for reasons I've already discussed, is not pertinent to any issue ultimately to be addressed today, I am prepared to accept Appendix D as "an informal guide for the investigating officer," but with the understanding that, as something characterized as an informal guide, it has perhaps somewhat less weight than formal regulation language.

There might be a ground for concluding that the "no rest or inner peace" status, that language in D–4(b), is without any relevant legal status. My colleague, Judge Bechtle, our current chief, said in *Masser v. Connolly,* 514 F.Supp. 734, 740 (E.D.Pa. 1981): "There is no requirement that an applicant for a conscientious objector discharge must show that continued service would 'deny him rest and peace.' Petitioner need only show that he is sincere in his opposition to war in any form."

I am not disposed to read "rest or inner peace" out of the law entirely. In fact, I think it has an honorable place in the relevant jurisprudence. My surmise—and I stress surmise because there is no research that underlies what I'm about to say—my surmise is that the concept of "rest or inner peace" traces at least indirectly back to the penultimate sentence of Justice Black's historic opinion in the *Welsh* case, which I've already quoted. That section—referring to section 6(j) of the Selective Service Act—"That section exempts from military service all those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war."

In the present case, assuming that the Board's inquiry into the question of "lack of rest or inner peace" is an appropriate one—and I do not undertake to quarrel with it—I find the Board's recital that the record "does not demonstrate a 'lack of

rest or inner peace'" unpersuasive. What the Board tells us is that "First Lieutenant Reiser claims to have had strong misgivings concerning her military commitments since 1985. While First Lieutenant Reiser now asserts that she cannot in good conscience be a part of the U.S. Army, she has served as an ROTC scholarship student from 1983–1986, and has been a member of the Army Reserve from 1986–1990, with the benefits that accrue, and did not seek release."

All that is, of course, the case. The factual record, with which the Board does not quarrel, is that the applicant felt a sense of strong moral unease dating back to ROTC service, at reserve camp in the summer of 1985; that her beliefs grew stronger through a variety of experiences and thinking, to which we've already referred, but did not mature into a fixed conviction of hostility to violence, implying a hostility to military service in any form, until April of 1990.

It was shortly thereafter, in August of 1990, that, acting on that now-fixed conviction, Dr. Reiser advised the Army of her intent to seek conscientious objector status. In short, it appears that Dr. Reiser did seek release within a matter of months after she recognized finally that she was at a moral impasse, that she could not go forward with service to the military given her profound moral reservations about violence.

Given that it is part of the required demonstration that the applicant for conscientious objection not be a conscientious objector at the time of entering service—I refer back to the *Shaffer* case, "that his beliefs did not become fixed until after entry into service," 531 F.2d at 128—it is apparent that there had to be a period (in this case it was an extended one) in which the applicant was wrestling with her growing moral unhappiness. The maturation of that process, according to the uncontradicted record, was not until April of 1990.

The final proposition put by the Board runs as follows: "Although the timing of an application alone is never enough to furnish a basis in fact to support a disapproval (paragraph 1–7a.(5)(c), AR 600–43), the timing of this application, upon the completion of a college education funded by an ROTC scholarship, a deferment to attend medical school, and just prior to entry on active duty in repayment for those benefits, calls the applicant's sincerity into question. First Lieutenant Reiser states she has had strong misgivings about her military commitment since 1985, but she has continued to receive benefits from the Army for an additional five years. Only as her active duty approached did she file for CO status."

In the *Shaffer* case, the Third Circuit stated that "the cases are legion which hold that the timing of an application for conscientious objector status is not a sufficient basis in fact to support a finding of insincerity." 531 F.2d at 130. The Board, in effect, acknowledges that, in citing that portion of Regulation 1–7a.(5)(c), which underlies its statement that "the timing of an application alone is never enough to furnish a basis in fact to support a disapproval." But the Board goes on to say that the timing of this application shortly before entry on active duty "calls the applicant's sincerity into question."

The Board is right in the sense that it calls the applicant's sincerity into question. What it does not do is answer that question. For the Board to answer the question, it must point to facts of record which undercut the bona fides of the application. This the Board has failed to do.

The language of the First Circuit, in a somewhat comparable case, *Lobis v. Secretary of the United States Air Force*, 519 F.2d 304, 307–308 (1st Cir.1975), is, I think, of pertinence here. This was the First Circuit speaking through Judge Campbell:

> It is true that one is more skeptical of the claims of a highly educated adult who reneges on a solemn and knowing agreement than of a younger and perhaps less well-educated individual whose late-crystallized claim was not preceded by a contract to serve made when it was to his advantage. But while the Air Force may justifiably be more suspicious of one who, having reaped all the benefits of his service connection, seeks to

reject its burdens, the yardstick applicable to a Berry Plan reservist is the same as that applicable to other servicemen.

Captain Lobis' narrative provided a plausible explanation of how his conscientious objections came to crystallize so suddenly in 1972 as a result of concern over reconciling his maturing moral beliefs with his membership in the military. *See Tressan v. Laird,* 454 F.2d 761, 762–63 (9th Cir.1972). Something more tangible than suspicion is needed to support a finding of insincerity. Otherwise, it would be but a short step to denying CO status to all Berry Plan enrollees, sincere or insincere. So long as we accept the possibility that conscientious scruples may flower at any time, and that once arising they take precedence even over contractual commitments, it is not easy to justify giving dispositive weight either to questionable timing or to such factors as a prior Berry Plan commitment.

The First Circuit went on to say this:

This court might nonetheless give substantial weight to the element of time were it reinforced by other evidence. Here, however, the principal other evidence is the investigating officer's finding of sincerity made after face-to-face interview. The Secretary has simply rejected this. Yet Air Force regulations provide that in evaluating an applicant's sincerity, one of the relevant factors to consider is the applicant's credibility. 32 CFR § 888e.10(c)(2)(ii). To ensure that this factor is taken into account, AFR 35–24 provides that an applicant's sincerity will be evaluated by the two officers, the chaplain and the investigating officer, who have had the opportunity of interviewing the applicant and, presumably, of assessing his sincerity through the use of criteria such as demeanor and persuasiveness.

To be sure, the First Circuit was there addressing the Air Force regulation, not the Army regulation. But the parallel seems, nonetheless, quite striking.

The Board here has rejected—not with explanation, so it seems to me, but summarily—the concurrent findings of the chaplain and the investigating officer, that Dr. Reiser is sincere. The question of sincerity is for DACORB the single decisive question. "The DACORB has determined that First Lieutenant Reiser has failed to establish, by clear and convincing evidence, that her stated beliefs are sincerely held." For that reason, the Board action expressed its "disapproval."

It is my considered judgment that DACORB did not demonstrate a factual basis of any sort for its conclusion that the applicant is insincere. For that reason, I think DACORB's determination cannot stand.

For these reasons, I will enter an Order granting the application for habeas corpus.