UNITED STATES of America

v.

Michael Herbert SHACTER.

Crim. No. 28278.

United States District Court

D. Maryland.

Dec. 12, 1968.

Stephen H. Sachs, U. S. Atty., and Theodore R. McKeldin, Jr., Asst. U. S. Atty., Baltimore, Md., for United States.

Joseph Forer, Washington, D. C., for defendant.

HARVEY, District Judge:

The defendant, Michael Herbert Shacter, has been charged in a one-count indictment with unlawfully and knowingly failing and neglecting on August 13, 1968 to perform a duty required by the Military Selective Service Act of 1967, in that he failed and neglected to comply with an order of his local draft board to report for and submit to induction into the Armed Forces of the United States. A motion to dismiss the indictment was heard and denied prior to trial.

At the trial, testimony was heard and exhibits were admitted in evidence, including defendant's complete selective service file which contained all pertinent information as to his classification, the various appeals taken by him, and his failure to report for and submit to induction. At the conclusion of the case, the defendant filed a motion for a judgment of acquittal based on three separate grounds. Both the motion and the merits of the case were fully argued by counsel and will be considered herein.

■ It is first claimed by defendant that there has been a failure of proof as to the allegation in the indictment that the defendant did not report for and submit to induction on August 13, 1968.

The government's Exhibit No. 1, at page 6, clearly establishes that the defendant on August 13, 1968 arrived at the Armed Forces Induction Center in Baltimore, Md. and refused to take the step forward which would have constituted his induction. In the opinion of this Court, the portion of Government Exhibit No. 1 in question was competent and admissible evidence directed to one of the factual issues raised by the indictment. The defendant's motion based on this first ground is therefore denied.

■ Secondly, it is contended that under United States v. Lybrand, 279 F. Supp. 74 (E.D.N.Y.1967), the government is required to prove that the defendant was ordered to report in accordance with the specified order of call set forth in Selective Service Regulations and that in the absence of any such proof of the order of call, the government has not established an essential element of its case. The *Lybrand* case dealt with a registrant who had been classified as a conscientious objector but who refused to report for civilian work in lieu of induction. This Court has been referred to no case applying such a principle to facts such as those present here. In any event, the Fifth Circuit Court of Appeals in Lowe v. United States, 389 F.2d 51 (1968), which was decided after *Lybrand*, held that it was not necessary for the government to prove the order of call as an essential element of its case. This Court adopts the reasoning of the *Lowe* case and holds that the government need not establish that the registrant was called in proper order and sequence in a case where the registrant has been classified I–A and refuses to submit to induction. The motion based on the second ground is therefore likewise denied.

The third ground for the motion raises the principal question presented in this case, namely, whether the defendant should have been classified by his local draft board as a conscientious objector. The motion will be denied as to this ground, and the question will be considered and decided on the merits.

The statute involved here is § 6(j) of the Military Selective Service Act, as amended June 30, 1967, 50 App.U.S.C. § 456 (j). Pertinent portions of this statute are as follows:

"(j) Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological or philosophical views, or a merely personal moral code."

It is not contended by the government that the defendant is not conscientiously opposed to participation in war in any form or that such beliefs are not sincerely held. The issue in this case is whether defendant's opposition to war stems (a) from "religious training and belief" as that term has been interpreted by the Supreme Court, in which event he should have been classified as a conscientious objector, or (b) from views which are essentially political, sociological or philosophical, or which represent merely a personal moral code, in which event he has been properly classified I–A.

Defendant is 21 years of age and single. After attending high school in Bethesda, Maryland, he graduated from a private preparatory school in Lenox, Massachusetts, and attended the University of Pennsylvania for one-half year. After filling out his Selective Service Form No. 100 upon reaching the age of 18, he requested and received Form No. 150, the special conscientious objector form. The completed Form 150 was returned to his local board on January 22, 1966. On January 25, 1966, he received the II–S or student classification. When he left the University of Pennsylvania after half a year, he was no longer entitled to this student classification, and on July 20, 1966, he was reclassified I–A. He requested a personal appearance and appeared before his draft board on September 9, 1966, at which time questions were addressed to him concerning his claimed exemption as a conscientious objector. On October 5, 1966, his I–A classification was continued.

Defendant thereupon took an appeal, and appeared before a Department of Justice hearing officer on July 19, 1967. As required by the statute at the time of his classification (but no longer necessary under the amendment effective on June 30, 1967), the Justice Department forwarded a recommendation to the Chairman of the Appeal Board that he not receive I–O or I–A–O classification. On May 2, 1968, he was classified I–A by the Appeals Board. A request for a Presidential appeal was denied. Defendant thereafter submitted to a medical examination, but after receiving due notice and reporting at the induction center on August 13, 1968, he refused to take the necessary step forward.

■ It is settled that in a case of this sort, the scope of review is narrow. As the Fourth Circuit Court of Appeals said in United States v. Jackson, 369 F.2d 936 (4th Cir. 1966), at page 938:

"In a criminal prosecution for a refusal to obey a Selective Service Board order 'the scope of judicial inquiry into the administrative proceedings leading to the defendant's classification is very limited.' Blalock v. United States, 247 F.2d 615, 619 (4 Cir. 1957). The courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant. Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567 (1946); Blalock v. United States, supra."

In United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the Supreme Court was called upon to construe the statute now before this Court in the form in which it then existed. § 456(j) was then in essentially the same form as the 1967 enactment which is presently before the Court except that its second sentence began as follows:

"Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, * * *."

In the *Seeger* case, a vigorous constitutional attack had been mounted against this statute by registrants claiming exemption as conscientious objectors in three separate cases. If the words "religious training and belief" were to be given a narrow construction, serious constitutional questions would have been presented, for then it could forcefully be argued that through this enactment Congress was in effect preferring some religions over others in violation of the First Amendment and the due process clause of the Fifth Amendment. As suggested by the concurring opinion, 380 U.S. at page 188, 85 S.Ct. 850, the Supreme Court in *Seeger* went to extremes to construe the statute so as to save it from demise on constitutional grounds.

In considering the meaning of the term "religious training and belief" (which is still contained in the statute), the Supreme Court said this at page 176, 85 S.Ct. at page 859:

"Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition."

■ This Court construes the statute here before it, that is 50 App. U.S.C. § 456(j), as interpreted by the *Seeger* case and as amended by Congress in 1967, to mean that conscientious objection reached as a result of a purely intellectual exercise, that is essentially by the application of reason, logic or aesthetic considerations, is not grounds for exemption from combatant training and service in the armed forces. Such a construction would appear to be required by the express language in the statute that the term religious training and belief does not include essentially political, sociological or philosophical views or a merely personal moral code.

On the other hand, if the conscientious objection results from a religious belief, or a belief which is based in substantial part on faith and which occupies the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption, then under the statute as interpreted by *Seeger* the exemption should be granted. Belief in a traditional God is not necessary. Indeed, the registrant Seeger did not believe in God, and yet the Supreme Court held that he was entitled to exemption as a conscientious objector. Nor is it necessary to have a belief in a so-called Supreme Being. Congress in the 1967 amendment to § 456(j), removed all reference in the statute to belief in a Supreme Being. What is necessary is that the belief be based on faith and that it occupy a similar place as do orthodox religious views.

Congress in enacting legislation granting exemptions from military service because of conscientious objection and the courts in interpreting such legislation are faced with the practical problem of determining when a registrant is sincere. If a person would be entitled to conscientious objection because of opposition to war based essentially on intellectual considerations, every well-educated applicant desiring not to serve

might readily secure exemption, whether he was in fact a conscientious objector or not. Sincere religious beliefs or sincere beliefs based on a demonstrable faith cannot be falsely assumed as readily as can views based essentially on the exercise of the intellect.

Furthermore, the history and background of exemptions based on conscientious objection, as outlined in the *Seeger* opinion at pages 169–173, 85 S.Ct. 850 show that exemptions based solely on grounds of logic or reason have never been contemplated by the law. In recognizing a duty to a moral power higher than that owed to the State, Congress has always required that conscientious objection must stem from religious beliefs or faith.

Applying these principles to the facts of the present case, it appears that the defendant was brought up under the tenets of Judaism. Both of his parents were Jewish, and defendant as a child attended Sunday School. By the time he was 18, he had rejected the concept that there was a God, as well as many other orthodox Jewish beliefs. Perhaps this is because in his mid-teens, his parents were divorced. However, the record shows that when he registered for the draft at age 18, he still retained many basically religious concepts that had been taught him earlier. Basic to these essentially religious views was his abhorrence of killing another human under any circumstances, a principle in which he had received instruction from his mother since an early age. Furthermore, his grandfather was a conscientious objector and did not serve in the armed forces.

In defendant's own words, he believed that the highest possible value must be placed on human life, that man's life is sacred, that mankind is a holy entity, that the killing of one of its parts is a sin no man can endure, and that man has a mortal human soul. He asserted that the mortality of the human soul was central to his belief. He conceded that he did not believe in God, but claimed that his feelings were religious and resulted in part from his earlier religious teachings. He professed to be a religious person and claimed that because his faith centered around mankind rather than around God, this did not mean that he was any less religious than a man who believes in God.

In the *Seeger* case, the registrant Seeger had described his views as a "belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed." He had stated that this "skepticism or disbelief in the existence of God" did "not necessarily mean lack of faith in anything whatsoever." In discussing the test to be applied, the Supreme Court said this, at pages 183–184, 85 S.Ct. at page 863:

"We recognize the difficulties that have always faced the trier of fact in these cases. We hope that the test that we lay down proves less onerous. The examiner is furnished a standard that permits consideration of criteria with which he has had considerable experience. While the applicant's words may differ, the test is simple of application. It is essentially an objective one, namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?

"Moreover, it must be remembered that in resolving these exemption problems one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the *claim of the registrant that his belief is an essential part of a religious faith must be given great weight.*" (Emphasis added)

The problem of course is that where an unorthodox faith is professed, as here, the draft board and the Court is given an incomplete and somewhat diffuse articulation, presented by a youth who is in his late teens or early twenties at the time that he is spelling out his beliefs. The task that the Court must

undertake in a case of this sort is to measure the unorthodox and poorly-defined concepts expressed by a defendant such as the one here against the objective test established by the *Seeger* decision. In this particular case, the problem is made easier by the fact that no question has been raised by the government as to the defendant's sincerity. That his beliefs were truly held and keenly felt is clear from the record. Furthermore, there is a consistency in his beliefs apparent from the time he filed Selective Service Form No. 150 in January of 1966 until he wrote the Appeals Board in March of 1968, although of course his concepts had been somewhat refined in this period of some 22 months and were better articulated when he presented them to the Appeals Board.

██ After careful consideration of the entire record and after giving great weight, as required by *Seeger,* to defendant's claim that his belief is an essential part of a type of religious faith, this Court concludes that this defendant's claimed beliefs occupy the same place in his life as an orthodox belief in God holds in the life of one clearly qualified for exemption. The defendant's early religious training, including instruction by his mother in the principles of conscientious objection, has been clearly established. His use of religious terminology in articulating his beliefs is likewise significant. Words used by defendant such as "holy entity", "sin", "sacred" and "mortal human soul" indicate that if defendant's present unorthodox views were not the direct result of religious training and belief, they certainly have a clearly discernible connection. The language that he has used indicates that these beliefs were not derived essentially by the application of reason and logic or were essentially the product of political, sociological or philosophical views. Rather they appear to be a product of faith, albeit a curious, almost perverse faith which glorifies man and his mortality but rejects the concept of an orthodox God.

In searching the record here for any basis in fact which would support the Board's classification, it should be noted that the Hearing Officer concluded that the defendant's beliefs were "the result of a purely personal belief or philosophy." A purely personal belief is clearly not the same as the statutory prohibition of "a merely personal moral code", which implies a code not based on faith or essentially religious origins. In using the terminology that he did, the hearing officer seems to have made an erroneous distinction between an internally derived and an externally derived belief. The *Seeger* case at page 186, 85 S.Ct. 850, states that no such distinction can as a practical matter be made, and it is clear that Congress did not intend such a meaning in enacting the statute. Furthermore, *Seeger* holds that if a belief meets the test laid down in that case, then a registrant's conscientious objection cannot be based on a merely personal code.

The government concedes here that defendant's opposition to participation in war is not based on political or sociological views. It urges, however, that his beliefs stem essentially from philosophical origins. A careful review of the record gives no indication whatsoever that defendant was influenced by a particular philosopher or that he was even a student of philosophy. On the other hand, the record clearly shows that he was instructed in Judaism, and his statements submitted in support of his claimed exemption are replete with indications that he has been strongly influenced by such religious teachings.

The government further notes that defendant told his draft board that he was an atheist. This statement, considered in the context of the record as a whole, would not provide a basis in fact for concluding that defendant's beliefs were not reached by reason of religious training and belief, as that term has been construed by the Supreme Court in *Seeger*. One of the approved meanings of the word atheist is one who does not be-

lieve in an orthodox God. But one who does not believe in an orthodox God is not disentitled under the terms of the statute to claim exemption as a conscientious objector. Seeger himself was held entitled to such classification in spite of his expressed disbelief in the existence of God. In the revised Selective Service Form 150 which was adopted after the 1967 amendment of the statute, the Question "Do you believe in a Supreme Being" (which defendant answered in the negative on the old Form), has been eliminated. In the *Seeger* case, the Court at page 183, 85 S.Ct. at page 863 quotes, as an example of an unorthodox view that is in essence the product of faith, from a work of Dr. David S. Muzzey, a leader in the Ethical Culture Movement, as follows:

> "Thus the 'God' that we love is not the figure on the great white throne, but the perfect pattern, envisioned by faith, of humanity as it should be, purged of the evil elements which retard its progress toward 'the knowledge, love and practice of the right.'"

The record here shows that defendant used the word atheist to mean that he did not believe in an orthodox God. Other statements of his establish that he was not an atheist in the sense that he claimed no belief at all that was a product of faith and that occupied the same place in his life as an orthodox belief holds in the life of a religious individual. A registrant who was an atheist in such latter sense would not under § 456(j) be entitled to classification as a conscientious objector.

For the reasons stated, this Court concludes that defendant's beliefs meet the test established by *Seeger* and that defendant's opposition to war is the result of religious training and belief as that term has been interpreted by the Supreme Court. Accordingly, there was no basis in fact for the draft board's action in refusing to classify defendant as a conscientious objector.

The verdict is therefore not guilty.