**John K. ROSS, Petitioner,**

v.

**Brigadier General John D. McLAUGHLIN and Stanley Resor, Respondents.**

**Civ. A. No. 539–69–R.**

United States District Court
E. D. Virginia,
Richmond Division.
Jan. 22, 1970.

Kendall M. Barnes, Jr., Alexandria, Va., David Rein, Forer & Rein, Washington, D. C., for petitioner.

David G. Lowe, Asst. U. S. Atty., Richmond, Va., for respondents.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, a member of the United States Army in which he enlisted after being inducted, seeks a writ of habeas corpus to effect his release upon his claim that he is a conscientious objector.

Jurisdiction of the Court is based on 28 U.S.C. § 2241; see also, United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969).

Respondents are the Commanding General at Fort Lee, Virginia, wherein he is stationed, and Stanley Resor, Secretary of the Army. Respondents have answered and filed with their answer pertinent records concerning the issues involved herein.

The Court having considered the pleadings, admissions contained therein, exhibits, stipulations made at the bar of the Court, and argument of counsel, finds as follows:

Petitioner, who has been a member of the armed forces since February 7, 1968, underwent basic training at Fort Lewis, Washington, attended a specialty school at Fort McClellan, Alabama, and has since October, 1968, been stationed at Fort Lee, Virginia, within this district. In June of 1969, petitioner received leave for purposes of attending his father's funeral, and while on leave received word of his orders for duty in Vietnam. On August 27, 1969, he made application for separation from the service pursuant to Army Regulation No. 635–20, which sets forth the policy, criteria and procedures for disposition of Army personnel who, by reason of religious training and belief, claim conscientious objection to participation in war in any form. Petitioner Ross in his application described his beliefs as contained in Footnote 1.[1]

1. Religious training and belief.

a) I believe that Man's ever-evolving creative spirit is the origin, essence, and purpose of the Universe; that the whole of the continuing life process reflects, serves, and fulfills a scheme of which every human being is necessarily a constant and vital part. I believe that the individual human life is the one cause and purpose of all the Universe.

The human Spirit is the greatest inspiration, the most sacred and essential thing which exists. Further, it is only Man that knows right and wrong, and, as a result of his freedom of choice, only Man can know the sins of violence and murder.

Because I believe that each human life is the vital source and final purpose of each moment in the Universe and that I feel the power of this spiritual force within me, I am compelled to live in respect of this highest existing force and thus cannot conscientiously participate in a formal institution which has as its sole function the preparation for and execution of the destruction of human life.

b) The beliefs which are the basis of my conscientious objection have roots in my general development since early childhood, through family and larger social experience, later through my education, and most recently and particularly through my military experience.

As is the case with most other youngsters I acquired a basic understanding of what other people are through the family experience. I learned to love, to cooperate, to share, that every man is dependent upon and bonded to his brother.

Imprinted into this core of my basic humanity were particular concepts about

man's purpose and reason for existence. Up until I was about eight years of age my family regularly attended the Episcopal Church in our area, and I naturally came to accept the rudiments of Christian living: to think of God as Love, to realize the importance of the Golden Rule, the Ten Commandments, and the evil of sin against God and man. Everyone I loved and respected accepted these basic teachings.

My mother and grand parents were active in several fraternal organizations which were basically Christian in doctrine and purpose. The exposure to these formal groups added another dimension to my faith in the virtue of living in responsible Christian Brotherhood.

It would be difficult to separate any of my beliefs from a basic view of the natural world of which man is a part. My whole temperament is largely a result of experience in appreciating the harmony of all living things living together. My family spent a great deal of time camping, staying at a ranch, at the beach, for both my father was and my mother is a great lover of the out-of-doors. I learned that the miracle of life is a product of all elements working together, that no living thing can exist as something separate, but is dependent totally upon and is totally a contribution to all the rest of the living world. I know that man holds a special place in the natural world and that he bears a tremendous responsibility as a living being.

I attend public schools until the twelfth grade, where natural science was my greatest interest. During my three years of higher education I attended for two years a small liberal-arts college where I majored in psychology. My basic beliefs were enhanced by an expanded appreciation of the dignity and sacred spirit of man in pursuing such courses of study such as Humanities, Sociology, Anthropology, and Psychology. It was while attending college that I became active in the peace movement, having strong doubts concerning the merit of the American foreign policy at that time.

I enlisted in the Army, after being inducted, with a feeling that, for better or worse, military service was part of my obligation as a citizen. I suppose I had very little idea, at that time, what it meant to be in the Army. During basic combat training I reacted with a natural repulsion to the violence and death involved in the preparation for war. Never having regarded a rifle as a means of killing men, I could not suppress basic doubts about why killing and war are necessary to human survival. During my training at Fort McClellan Chemical School, I was convinced even more when I learned of the horrible and insidious methods of chemical, biological, and radiological warfare. Through all of this, though, I did my best on the course I had agreed to follow, as my record will indicate. I was resigned to the fact that participation in the military was an all or nothing proposition.

More recently I began to be shaken by the realization that I had the technical and emotional capability of killing and that this was no more than was expected of me. I began to recognize that killing and destruction had become part of my way of thinking. I actually began to have dreams and fantasies of solving disputes with a machinegun. I saw that as a soldier I was personally involved in and responsible for the organization of warfare, and the conflict and frustration within me grew to the point where I could hardly stand to be around or speak to my family or longtime friends. I was torn by my feelings of guilt over the acceptance of my role as a soldier. I could no longer convince myself that I had a love for my fellow man.

Then in June my father died. This was something different from the cold impersonal death that men learn to live with in the Army. I had been in the Army for more than a year. I had tried my best to close my mind to the doubts that I had been experiencing and to do what I was told. My father's death evoked more in me than sorrow of personal loss. It gave a new reality to my awareness that as a soldier it was my business to create families without fathers. And it made me newly aware of the considerable influence which my father had, and will always have, over the way in which I live my life.

Being home under such new and strange circumstances aroused many deep and disturbing feelings within me. I felt a shocking dislocation between what I was doing with my life as a soldier and what I really was as a responsible living and loving human being. The whole situation evoked within me a fresh and powerful way of looking at myself. I began to realize the vast extent to which I was a product of those I grew up with and how I was inseparably a living continuation of my father. All of what he was as a man and a father ran through my mind. A description of my father's character is central to an understanding of my training and belief not only because to a large extent his beliefs are mine, but because the extraordinary impact of his death

Accompanying Ross' application were letters from a former college professor, a former employer, and his family dentist.

Pursuant to the provisions of A.R. No. 635–20, he was interviewed by an Army chaplain, a psychiatrist, and a disinterested officer of the rank of captain, a Captain Holloway.

The chaplain made no recommendations, but evidenced his acceptance of the sincerity of the applicant's stated faith and belief, and further stated, "It is my opinion that the objections of Specialist Ross to continued military service and reassignment to the Republic of Vietnam are based on convictions of an ethical/philosophical nature."

The captain who had interviewed Ross recommended disapproval of the application, basing his recommendation on his conclusion that Ross' ideas were of a political and philosophical nature and had no bearing on his religious beliefs.

Ross' unit commander, it was stipulated at the bar of the Court, had recommended approval of petitioner's application although said recommendation is not to be found in the files of the military, it having been withdrawn and replaced by a letter from his unit commander dated October 16, 1969, recommending disapproval.

The psychiatrist's report simply cleared the applicant psychiatrically for such action as was appropriate.

Pursuant to the Army regulation, the application proceeded through the chain of command receiving recommended disapproval, except as herein noted, until it reached the Commanding General of Fort Lee, who recommended that the application be approved. Subsequent to the Commanding General's recommendation, the matter went before the Army's Conscientious Objector Review Board who issued an opinion disapproving the

made me see myself and the course of my life in a new light.

My father tremendously influenced my life through his conscious efforts to guide me and by the manner in which he conducted his own life. He commanded my strong respect, even through our conflicts, not as a result of his control from a power position, but by his being a man of virtue and compassion, a man who always sought the positive and the good in people. My father was a gentle nonviolent man: he never physically punished any of us children; communication, encouragement, and example were his way of teaching. He had a vast faith in the capability of people to solve problems through positive social contact. He had no respect for violent force. He was a sportsman in the best sense of the word. I often accompanied him in the mountains and woods where I learned of the rewards of cooperation and sharing of appreciation in the beauty and harmony of nature. These experiences were always times of a closer communion where we discussed the ways and situations in which human beings helped and hurt one another. I recall that these were times when he spoke of belief in God and of his faith in the basic good in the human soul. My father had been a fireman during the war and was constantly emphasizing safety with autos, machinery, tools; he was always concerned for the well-being of

others. Fundamental to beliefs and values he projected to all those who knew him was a profound respect for the individual's right and obligation to make moral decisions. He was never confronted in his own life with the prospect of military service. He was reserved in expressing his convictions about my role as a soldier. But when my brother affirmed his beliefs as a conscientious objector last summer, Dad's support was open and strong.

At the time I was home with my family, in very intimate and personal surroundings, the loss of such a central part of me brought into fresh focus all that I have done and become, and the realization that, more than ever, I was an individual responsible for myself and for all the people of my life. Receiving word of my orders to go to Vietnam intensified the vast disparity between my role as a soldier and my deep responsibility as a part of humanity. These orders in themselves were no different from any other orders, but the effect of my father's death and of the most painful soul-searching made me see these orders in a different way from all that had come before. I realized the essential destructive purpose of all military service and I know that I cannot conscientiously participate in any way in the business of making war.

application, and the matter then went to the Adjutant General of the Army who formally disapproved same on the grounds: (1) Applicant does not truly hold views against participation in war in any form which are derived from religious training and belief; and (2) Applicant's professed views became fixed prior to his entry into the military service. This disapproval gives rise to the instant action.

■ The scope of review to which this Court is limited in a case of this nature has been succinctly described by Judge Winter of this Circuit as a "sharply limited one of determining whether there was a basis in fact for finding petitioner was not a conscientious objector." See United States ex rel. Brooks v. Clifford, *supra*; see also, Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); U. S. v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

The Department of Defense issued a directive effective May 10, 1968, and subsequently amended, which spells out the criteria for determining conscientious objection and procedures to be followed in regard to persons inducted into military service who claim to be conscientious objectors when they assert such claim. This directive from the Department of Defense, No. 1300.6, and Army Regulation No. 635–20, provide for discharge of military personnel who develop, subsequent to entry into active military service, the conscientious opposition to war as spelled out by Congress in 50 U.S.C.A. App. § 456(j), which in essence provides that no person shall be required to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form.

■ The file reflects no conclusions based on any facts contained therein which would warrant a description of Ross' views as being insincere. As pointed out by counsel, the reasons assigned by the Review Board for its disapproval go to their conclusion as to his lack of religious conviction. The issue of his sincerity is, of course, pertinent. Of the military who interviewed Ross pursuant to Army regulations, no one questioned the sincerity of his beliefs. Any doubt as to sincerity must have a rational basis. See United States v. Hesse, 417 F.2d 141 (8th Cir. 1969). Mere speculation or conjecture as to insincerity is not enough, Witmer v. United States, 348 U.S. 375, 381, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

This Circuit has described the regulatory scheme adopted by the Department of Defense and the United States Army in cases of this nature as having been generously designed to protect soldiers who, after enlistment, find war morally repugnant and impossible to square with religious beliefs, see United States ex rel. Tobias v. Laird, 413 F.2d 936 (4 Cir., 1969).

It is not only contemplated, indeed it is required under the Department of Defense directive, that "evaluation of the sincerity of a claim of conscientious objection requires objective consideration of professed belief not generally shared by persons in the military service. For that reason, particular care must be exercised not to deny bona fide convictions solely on the basis that the professed belief is not compatible with one's own." See Directive, ¶ 5(c), DoD 1300.6.

Up to the point where Ross' application commenced its ascent through the chain of command there was no hint of any conclusion going to the lack of sincerity in Ross' claim. Indeed the exhibits accompanying the application, consisting of letters from people who had known petitioner prior to his entry into the service, all affirmed their unequivocal belief in his sincerity. Neither the captain who interviewed Ross, nor his unit commander, who, it is fair to assume had some personal contact with him, made any allegation of insincerity. Indeed his unit commander, as the Court has previously mentioned, recommended approval of his application. If there was any reference to Ross' alleged lack of

sincerity in that recommendation, it became as illusory as the reasons assigned for the lack in the military file of the original affirmative recommendation.

None of the individuals, or the Conscientious Objector Review Board, assigned any legally sufficient reason to support their recommendations. None of the reasons given for the denial of this petitioner's application are founded on a basis in fact. Indeed the Review Board refers to Ross' unit commander as having determined that petitioner was motivated by his orders to Vietnam.

■ It is to be borne in mind that, assuming *arguendo* that the prospect of assignment in Vietnam may have played a role in petitioner's decision, this would not in and of itself support a basis in fact for the Army's refusal to accord this petitioner his rights under the law. Admittedly the prospect of Vietnam intensified, as he put it, "the vast disparity between my role as a soldier and my deep responsibility as a part of humanity." Without something more there could not be ignored petitioner's own statement that those orders in themselves were to him no different than any other orders. Indeed there is no longer any doubt that the mere fact that the prospect of combat duty in Vietnam may have acted as a catalyst and may have affirmatively been the stimulus for the submission of a request for discharge, is not, standing alone, sufficient to represent a basis in fact to reach the conclusion made in this case. See *Tobias, supra.*

A cursory examination of the application makes out a prima facie case in support of petitioner's request for discharge when taking into consideration the national policy set out by Congress.

Coming now to the Review Board's findings that petitioner's beliefs were not religious in nature within the meaning of § 456(j) of the statute and the Army Regulations, this Court feels the answer is readily ascertainable in the pronouncements of the United States Supreme Court in United States v. Seeger, *supra.* It is not necessary to be a member of any organized church to sustain a claim of conscientious objector. See also, Batterton v. United States, 260 F.2d 233 (8th Cir. 1958).

■ The test as expressed in *Seeger, supra,* is an objective one, namely, "Does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" Once an individual's beliefs meet that test then it cannot be said that one's objections to service are based on a "merely personal" moral code.

■ The only specific reason assigned by the Conscientious Objector Review Board of the Army and its finding that petitioner did not qualify on the grounds that he did not truly hold a religious belief is that "He is not associated with a religious governing body." That reason as a factual finding is not, standing alone, a basis for denial of conscientious objector status. See *Seeger, supra;* Williams v. United States, 216 F.2d 350 (5th Cir. 1954); United States v. James 417 F.2d 826 (4th Cir. 1969).

■ The Court has no difficulty in concluding that there was no basis in fact for denial of petitioner's application. While perhaps superfluous under the circumstances to state that the Review Board was factually in error in its finding as a fact that "Every other officer in the chain of command recommended disapproval," the record shows with clarity that he who, unless the system has vastly changed since this Court's military service, was the key link in the chain of command, to-wit: the commanding general of the petitioner's Army base, recommended approval. Hence any decision of the Board which rested on that erroneous finding is legally of no consequence. See Manke v. United States, 259 F.2d 518 (4th Cir. 1958); United States v. Jakobson, 325 F.2d 409 (2d Cir. 1963).

■ The only other conclusion of the Review Board which bears mentioning is its conclusion that Ross' views became fixed prior to entry into active

military service. There is not the slightest scintilla of evidence to support any such finding. One's participation in anti-war demonstrations could hardly be considered as conclusive proof that one was a conscientious objector.

■ Having concluded there is no basis in fact for the Army's ultimate refusal to grant this petitioner the relief sought, it is this Court's responsibility and obligation to cause the writ of habeas corpus to issue. An appropriate order in conformity with this memorandum will be entered.