Robert Jay COHEN, Stephen M. Gaydos, Calvin Clay Greene, III, Jose F. L. Medina, and Francisco Rivera Pomales, Petitioners,

v.

Melvin LAIRD, Secretary of Defense, Stanley R. Resor, Secretary of the Army, and Major General James F. Hollingsworth, Commanding General of Fort Jackson, South Carolina, Respondents.

Civ. A. No. 69–1085.

United States District Court,
D. South Carolina,
Columbia Division.

June 26, 1970.

Jack F. McGuinn, Columbia, S. C., for petitioners.

Joseph O. Rogers, Jr., U. S. Atty., and Charles W. Gambrell, Asst. U. S. Atty., Columbia, S. C., for respondents.

## OPINION and ORDER

DONALD RUSSELL, District Judge.

By a single petition, the five petitioners filed this proceeding in habeas corpus to secure their discharge from the Army as conscientious objectors under Army Regulation 635–20.[1] They contend both that the Army failed to follow its own regulations in denying their application and that it was without basis in fact for such denial. Under those circumstances, they took the position the denials represented a violation of their constitutional rights. With the filing of the petition, a temporary restraining order was sought to enjoin the dispatching of any of the petitioners to Vietnam. Such restraining order, and later, a temporary injunction, were issued.[2]

1. See, also, Department of Defense Directive 1300–6.

2. In re Petition of Kallmann (D.C.Hawaii 1969) 307 F.Supp. 412 supports the grant of such restraining order but see Kimball v. Commandant Twelfth Naval District (9th Cir. 1970) 423 F.2d 88, 90, to the contrary.

Though I have, reluctantly, and with perhaps questionable authority, permitted this action to proceed as a joint action by all the petitioners, it is, of course, necessary to treat and determine the application of each petitioner separately on the facts peculiar to that individual. All petitioners are not equally entitled to relief nor are the facts in all cases identical.[3] I shall accordingly deal individually with the claims of the several petitioners, taking them up in the order followed in the arguments of counsel.

The first application for consideration is that of Stephen M. Gaydos.

## I. GAYDOS

Petitioner Gaydos is a well-educated and intelligent individual, a graduate of Duquesne University. At the required time, he registered under the provisions of the Selective Service Act. Neither at the time he registered nor at any subsequent date prior to his actual induction did he claim the status of a "conscientious objector". In his application for such classification filed after his induction, he, while apparently conceding the existence of his right to exemption at the time he registered under Selective Service, justified his omission of such claim for exemption on the ground that his objections to war at that time "was only a theory", "theory only in the sense that it was abstract, in the sense that I had never gone through the experience", "the experience of being in the military".

On February 20, 1969, he was inducted into the military service under the terms of the Selective Service Act at Fort Jackson, South Carolina. He completed his "basic combat training" on April 26, 1969. He was thereupon detailed to infantry training at Fort Jackson. While so detailed, he filed on June 18, 1969, his application for discharge as a conscientious objector under the terms of Army Regulation 635–20. This Regulation authorizes the discharge of military personnel, developing, after entry into military service, a conscientious objection to war as defined in 50 U.S.C.A. App., sec. 456(j).

In his application for discharge, petitioner rested his claim on religious grounds, gained, as he phrased it, by reading the Bible and certain "Catholic works", including particularly "documents of Vatican II", issued about 1965. He indicated in his testimony that the "Catholic works" to which he referred had been studied by him while at college but apparently not with the same concrete application as after he was inducted into military service. These "works" established that the early Catholic Church was unalterably opposed to war and that the early Christians preferred being "fed to the lions" to participating in war.[4] He listed three persons who had some knowledge of his beliefs. Two of them were a husband and wife, living in Pittsburgh and listed as "family friends", and the third, also a "family friend", of New Castle, Pennsylvania. No letters in support of the application, though, were submitted or have since

---

3. See United States v. Corliss (2d Cir. 1960) 280 F.2d 808, 815, cert. den. 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105, where the Court said that the issue in a case such as this is " * * * the sincerity of the individual's belief, not the nature of the teachings of any religious faith. Each case must stand or fall on its own facts."

4. This version of early Christian history is at variance with that given by at least some secular historians. Thus, while Gibbon indicates that early Christians refused to take active part in both civil

and military Government, Guizot in his notes appended refers to the large numbers of Christians in the Roman Army in those early days. See Chapter XXV, Gibbon's ROMAN EMPIRE, as edited by Guizot, Vol. II, pp. 188–9, note g. And their early persecution in Nero's reign arose out of Nero's wish to find a victim on whom he might shift blame for Rome's burning. See, also, Cambridge Ancient History (2d Impression, 1952), Vol. 10, pp. 725–6. Subsequent persecutions had other reasons, of course; but mere refusal to bear arms seems, at best, to have been a subsidiary cause, if at all.

been filed. In his application, he listed only two organizations with which he had been affiliated and in which he had been active. These were a social fraternity and an Economics Club. He did not set forth any religious activities on his part or identify any church activities in which he had taken part. Neither did he specify any occasions or situations in which he had expressed or manifested any moral or ethical revulsion against war or the forms it assumed.

The Department of Defense and the Army have promulgated an administrative machinery for evaluating claims for discharge by Army personnel on the grounds of conscientious objection. Such machinery has been appropriately described as "generously designed to protect soldiers who, after enlistment, find war morally repugnant and impossible to square with religious principle." [5] United States ex rel. Tobias v. Laird (4th Cir. 1969) 413 F.2d 936, 937. The procedure contemplates that the application first be submitted to the applicant's "immediate commanding officer", who shall indicate his approval or disapproval thereof, with comments. Additionally, he is to be given a counseling interview by a chaplain and a psychiatrist. The chaplain is to "have an opportunity to review the entire application" and his report should include "definitive comments as to the sincerity of the applicant's conscientious objection to the bearing and use of arms, an opinion as to whether or not this conviction is primarily religious in basis and origin, and the rationale upon which the statement is based." The psychiatric report is seemingly confined to the determination of the presence or absence of any psychiatric disorder warranting treatment. Thereafter, the applicant is af-

forded an opportunity to appear in person with or without counsel, before an officer in the grade of Captain or above, other than applicant's immediate commanding officer. This hearing officer is to be knowledgeable in policies and procedures relating to conscientious objector matters. The Regulations, also, provide for referral of the application to the applicant's Selective Service Board for review, if the application is filed within 180 days after the draftee's induction, and for final review by a Class 1–0 Conscientious Objector Review Board in Washington.[6]

The procedure for handling applications for discharge as a conscientious objector, as set forth above, was observed in this case by the Army. Thus, after the petitioner filed his application, his commanding officer on June 18, 1969, reviewed it and disapproved it as wanting in sincerity. He assigned as a basis for such conclusion that, "If he had been (sincere), he wouldn't have actively participated in Basic Combat Training, which included qualifying with the M–16 Rifle. He did not object to any of the combat training given in Basic, so I feel he is not sincere in his beliefs." On June 27, 1969, the application was reviewed at the next level in applicant's chain of command. Again, the reviewing officer recommended disapproval. In so doing, he referred to the fact that "the reasoning contained in his application is, in many instances, an identical word-for-word copy of other applications which have passed through this headquarters (all of whom have been counselled by a certain Father Peter Clarke). This would indicate that the application is not necessarily the thoughts of the applicant." The interviewing officer, also, remarked that the petitioner was a "Roman Catholic and is

---

5. The qualification of "religious principle" should probably be construed to embrace the broad definition set forth in the majority opinion in Welsh v. United States (1970) 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308.

6. This statement of procedure is comprehensively set forth in United States ex rel. Brooks v. Clifford (4th Cir. 1969) 409 F.2d 700, 702–703, reh. denied 412 F.2d 1137.

therefore applying on the basis of individual beliefs."[7]

The petitioner was thereupon interviewed on June 30, 1969, by Chaplain Hartlage, a "Catholic Chaplain". Chaplain Hartlage indicated his disbelief in the sincerity of the petitioner's claim, concluding that, "Under the tutelage and choice readings furnished by Rev. Peter Clarke he now sees the light." The Chaplain observed with reference to Father Clarke, referred to in the application, that "we cannot allow a few warped radicals as Peter Clarke (and that's who should be on trial here) to destroy the teachings of a life time in a couple of months."

On July 15, 1969, petitioner was interviewed by a psychiatrist, whose comment was that, "There is no psychiatric contra-indication to classifying him as a *conscientious objector.*"

On July 24, 1969, petitioner was given a hearing before Captain McIntyre, who was without applicant's chain of command and was knowledgeable in conscientious objector matters. Prior to the hearing, Captain McIntyre reviewed the petitioner's file. After the hearing, Captain McIntyre recommended disapproval. He stated that the petitioner was "the typical trainee coming out of the 3d AIT Brigade here at Fort Jackson claiming to be a conscientious objector. This group in the 3d Brigade (which is our infantry training) is receiving help in filling out applications from a group in Columbia, SC. They have copies of AR 635–20 and are thoroughly familiar with the contents." [8]

The petitioner's application was, also, referred to his Selective Service Board, which advised the Army on August 19, 1969, that, "Based on the information contained in the applicant's file," it would not have classified the petitioner as a conscientious objector.

All recommendations, along with petitioner's application, were thereupon reviewed by the Class 1–0 Conscientious Objector Review Board in the Office of the Secretary of the Army.[9] On September 8, 1969, that Board disapproved the application, stating, "The Board finds that Gaydos does not *truly hold* views against participation in war in any .form which are derived from religious training and belief" (Italics added).

On September 11, 1969, the petitioner was told by his commanding officer that the Adjutant General had advised that his application had been disapproved for the reason that the "Applicant does not truly hold views against participation in war in any form which are derived from religious training and beliefs." The petitioner was shown the actual notification from the Adjutant General, with the above reasons set forth, and duly acknowledged such fact in writing. He was not, however, shown the formal opinion of the Conscientious Objector Review Board.

---

7. In its opinion the Conscientious Objector Review Board took this statement to mean that the interviewing officer "erroneously concluded that a Catholic may not meet the test of a conscientious objector under AR 635–20". It does not appear that the Board's interpretation of the officer's statement is necessarily correct; at any rate, he was applying the proper rule, which was to look to the "individual beliefs" of the applicant and not to the tenets of his church. United States v. Brown (3d Cir. 1970) 423 F.2d 751, 754; Keefer v. United States (9th Cir. 1963) 313 F.2d 773, 777.

8. See United States v. Hosmer (D.C.Me. 1970) 310 F. Supp. 1166, 1169, where contention is made that in preparing his application the applicant had the assistance of his lawyer and the application represented more thoughts of his lawyer than his own. This appears to have been largely the thought of the hearing officer in this case, it being his opinion that the application represented basically the thoughts of Father Clarke and not those of the applicant.

9. This Board was constituted by Order of the Secretary of the Army on June 17, 1969, effective June 23, 1969. Its directive was: "To review in-service applications for classification as I–O Conscientious Objector."

On December 3, 1969, after the filing of this petition, the petitioner, in his own handwriting, filed with his Company Commander a request "to return to my company for the purpose of continuing my training in A.I.T."

At the hearing in this Court, the petitioner testified at length.[10] He criticized several of the interviews accorded him in the Army hierarchy. He stated that the Chaplain who interviewed him told him that he could never have been taught "by any Catholic instructor that it was wrong for Catholics to participate in warfare." It would appear from this statement that the petitioner, in the interview, had taken the position that Catholic dogma forbade participation in war. Petitioner particularly complained that the Chaplain did not shake hands with him at the conclusion of the interview. He, also, said that the interviewing officer, Captain McIntyre, had asked him only "minor points about my (his) belief" and had not allowed him "to go in depth into my beliefs." He conceded, however, that Captain McIntyre did not deny him the right to express or set forth his views.

Petitioner, also, called Father Clarke as a witness on his behalf, primarily as an expert on Catholic dogma and not on the petitioner's own "subjective beliefs". Father Clarke testified to what had been the various attitudes of his church towards war in terms that tracked to a substantial degree the statements on this point in petitioner's application. He testified, even as the petitioner set forth in his petition, that the early Catholic Church proscribed any bearing of arms by its communicants, even enjoining them to prefer death to participation in war. Later whether under St. Augustine or St. Thomas Aquinas— there seems to be some difference between the petitioner and Father Clarke on this point [11]—there developed the concept that Catholics might participate as combatants in a "rational" war, on the "rational" side. Father Clarke referred particularly to Pope John XXIII's encyclical that "war is no longer a rational means for settling disputes between nations." [12] It is not clear

---

10. It would seem that the legal sufficiency of the determination by the Army is tested by the record before it. Bates v. Commander, First Coast Guard District (1st Cir. 1969) 413 F.2d 475, 477, note 2. No more than the Court is permitted to create a new record in cases filed under Selective Service proceedings is a Court to be allowed to create a new record in post-induction cases involving the correctness of Army determinations. To permit such procedure is to substitute Court judgment for Army judgment. The issue concerns solely the record on which the Army acted. See, Cox v. United States (1947) 332 U.S. 442, 455, 68 S.Ct. 115, 92 L.Ed. 59, reh. den. Thompson v. United States, 333 U.S. 830, 68 S.Ct. 449, 92 L.Ed. 1115; United States v. Ruppell (D.C.N.Y.1968) 278 F.Supp. 287, 290. In an endeavor to provide petitioners with an opportunity to impeach any of the statements in the Army records, especially as it related to sincerity in observance of Army regulations, however, I permitted the petitioners to offer such testimony as they wished. Cf. Silberberg v. Willis (1st Cir. 1970) 420 F.2d 662, 665.

11. Petitioner stated in his application that "the early church, during the first five centuries, (until Augustine 'invented' the idea of a just war) was totally opposed to all war."

This theory that Catholic faith only allows its communicants to participate in wars they consider just was used by another applicant, in a different way from the applicant. He sought classification as a conscientious objector because he considered the Vietnam war unjust. He contended that he was convinced that the Vietnam war was "unjust" and that, accordingly, as a good Catholic, he could not, in obedience to the tenets of his Catholic faith as understood by him participate in a war he conscientiously felt was "unjust". Such contention was dismissed in United States v. Spiro (3d Cir. 1967) 384 F.2d 159, cert. denied 390 U.S. 956, 88 S.Ct. 1028, 19 L.Ed.2d 1133.

12. This is a view to which all thoughtful people, irrespective of religious faith, would subscribe.

from the record, though it can also be inferred from his testimony, that Father Clarke aided in the preparation of Gaydos' application for discharge. Thus, in referring to certain documents identified by him, Father Clarke said, "I'm not sure whether I submitted this as part of an application or not with Stephen Gaydos."

■ At the conclusion of the hearing, the petitioner both orally and by written argument, raised certain procedural objections, no one of which has merit. One was peculiar to this petitioner's claim; the other applied generally to all the claims. First, (with reference to Gaydos' claim) he contended that the interviews by the Chaplain and the hearing officer were required, under the Army Regulations, to precede in point of time the recommendation made through the chain of command. Petitioner's counsel has cited nothing from such Regulations supporting this argument. Actually, the Regulations state that the chaplain "will have an opportunity to review the entire application", which, it would seem, means the entire file, including the recommendations of the applicant's commanding officer. So far from supporting the petitioner's position in this regard, the Regulations thus seem to rebut it. Next, the petitioner Gaydos as well as the other petitioners, urge that, contrary to the Regulations, they were never personally advised by the Adjutant General that their applications had been denied or given any reason for their denial. It is true the full report of the Board was not made available to petitioners but this does not seem required. They were all given a statement of the reasons in sufficient detail. Nor were they personally advised by the Adjutant General of the

disapproval of their applications. Through military channels, the Adjutant General did communicate to them both the denial of their applications and the reasons therefor. This is the normal military procedure for communications between military personnel. It is purely captious to argue that the Adjutant General had personally to deliver such notice to the petitioners. The petitioners were all given notice from the Adjutant General in the proper military way and all duly acknowledged in writing the receipt of such notice. The requirements of the Regulations were thereby fully complied with.[13]

The petitioner, subsequent to the disapproval of his application, requested on December 3, 1969, reassignment to his A.I.T. unit, seemingly thereby abandoning his prior claim to the status of a conscientious objector.

■■ Turning now to the power of this Court, under the above facts, to reverse the determination of the Army in this particular case, it must be remembered that the jurisdiction of this Court to review and reverse determinations made by the appropriate military authorities is very limited. In fact, it has been denominated the "narrowest known to the law". Blalock v. United States (4th Cir. 1957) 247 F.2d 615, 619.[14] Such determinations can only be overturned if without any "basis in fact". Witmer v. United States (1955) 348 U.S. 375, 380–381, 75 S.Ct. 392, 99 L.Ed. 428; Packard v. Rollins (8th Cir. 1970) 422 F.2d 525, 527. Every conscientious objector case presents two questions: One is the sincerity of the claimant; the other is the qualification of the applicant's belief under the statutory test. United States v. Corliss, *supra*, (280 F. 2d at pp. 814–815). The "threshold"

13. The full reasoning of the Board has been incorporated in this record and the petitioner has had full opportunity to review and rebut it as far as he can within the record. See, in such connection, United States v. Verbeek (9th Cir. 1970) 423 F.2d 667, 668.

14. The scope of review is precisely the same in applications for conscientious objector status after induction as in classification under Selective Service. Bates v. Commander, First Coast Guard District, *supra* (413 F.2d at p. 477); Hammond v. Lenfest (2d Cir. 1968) 398 F.2d 705, 716.

question however, and the one which must first be affirmatively answered, is the petitioner's sincerity in his claim for discharge as a conscientious objector—in his sincerity "in objecting, on religious grounds, to participation in war of any form". United States v. Henderson (5th Cir. 1969) 411 F.2d 224, 226. Such initial issue, involving as it does, the subjective state of another's mind is "not amenable to unerring objective determination." Bishop v. United States (9th Cir. 1969) 412 F.2d 1064, 1067. In resolving such issue, the Army may rest a denial on disbelief of the sincerity of the claimant, without more; such disbelief may not, though, be an arbitrary determination. It must, on the contrary, be honest and rational. Owens v. Commanding General (D.C.Cal.1969) 307 F. Supp. 285, 287. If, though, the military's disbelief in the applicant's sincerity is "honest and rational", there is such "basis in fact" for the determination made by the military as to bar relief in this Court. United States v. Corliss, supra (280 F.2d p. 814); United States v. Hesse (8th Cir. 1969) 417 F.2d 141, 143.

■ Any objective fact which casts a "rational" doubt on the veracity or sincerity of the petitioner is relevant. See Witmer v. United States, supra (348 U.S. p. 382, 75 S.Ct. 392); United States v. Henderson, supra (411 F.2d p. 227). It may be a fact which, while insignificant standing alone, may, when considered in context, lend support to a finding of insincerity. Keefer v. United States (9th Cir. 1963) 313 F.2d 773, 777. Thus, lateness in the assertion of the claim, if not adequately explained, or prior inconsistent activity are factors that are properly considered in evaluating the applicant's sincerity and veracity. Campbell v. United States (4th Cir. 1955) 221 F.2d 454, 457; United States v. Broyles (4th Cir. 1970) 423 F.2d 1299, 1305; United States v. Milliken (9th Cir. 1969) 416 F.2d 676, 679; United States v. Sprinkle (D.C.N.C. 1959) 176 F.Supp. 811, 813. The failure of the claimant to have given any expressions consistent with his claim prior to filing his application is a factor to be considered. Witmer v. United States, supra (348 U.S. p. 383, 75 S.Ct. 392).[15] Moreover, the timing of an application (such as, following orders for Vietnam) is valuable in evaluating an applicant's sincerity. Witmer v. United States, supra (348 U.S. p. 382, 75 S.Ct. 392); Bishop v. United States, supra (412 F.2d p. 1068); cf. Speer v. Hedrick (9th Cir. 1969) 419 F.2d 804; Application of Coryell (D.C.Cal.1969) 307 F.Supp. 209, 212; United States v. Blackwell (D.C. Me.1970) 310 F.Supp. 1152, 1156.[16] And, while the applicant's failure to claim exemption under Selective Service may, if the claim is of later maturing of beliefs, be irrelevant, the reasons given for such failure to claim exemption may be such as to reflect on the applicant's credibility and thus on his sincerity. As I have said, though, a bare conclusion of insincerity, "a mere ipse dixit of lack of sincerity" by an interviewing officer, without any "rational" supporting statement, is insufficient; the conclusion must be supported by some objective fact, however slight. United States v. Corliss, supra (280 F.2d pp. 814–815);

15. Thus in Witmer, p. 383, 75 S.Ct. p. 396, the Court, in its catalogue of circumstances to be considered on the issue of sincerity, said:

"Among these is petitioner's failure to adduce evidence of any prior expression of his allegedly deeply felt religious conviction against participation in war."

16. In the last-cited case, the Court said: "However, the fortuitous timing of such a claim is a circumstance which may properly be considered by the Board, for as Judge Friendly has aptly observed:

" 'Sudden accessions of belief may be utterly sincere, as the memorable one on the Damascus road; but they seldom synchronize so perfectly as (registrant's) with external facts making them convenient, and they normally manifest themselves in expressions more deeply personal than his.' "

Of course, as against positive evidence of sincerity of compelling purport, mere timing, standing alone, may be insufficient. United States ex rel. Tobias v. Laird, supra (413 F.2d pp. 939–940).

United States v. St. Clair (D.C.N.Y. 1968) 293 F.Supp. 337, 345.

Whether there is such "honest and rational" basis is, however, a question properly justiciable in this proceeding. United States ex rel. Brooks v. Clifford, *supra* (409 F.2d pp. 705–706); Cooper v. Barker (D.C.Md.1968) 291 F. Supp. 952, 957. "However", it must be remembered, "if there exists any inconsistency or honest or rational disbelief with the defendant's claim, then it is not for this court to weigh the substantiality of these facts to find any basis-in-fact." United States v. Hesse, *supra* (417 F.2d p. 144.)

I am of opinion that the petitioner Gaydos has not established that there was an absence of a rational basis for the determination by the Army that his claim to conscientious objector status was insincere. Unlike the situation in United States v. James (4th Cir. 1969) 417 F.2d 826, and Ross v. McLaughlin (D.C.Va.1970) 308 F.Supp. 1019, 1023, for instance, the petitioner supplemented his application with no statements from reliable persons who had known him in the past and attested to prior expressions consistent with his present claim. Contrary to the circumstances in United States v. Seeger (1965) 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; Welsh v. United States, *supra*; United States ex rel. Tobias v. Laird, *supra* (413 F.2d 936); Packard v. Rollins, *supra* (422 F. 2d 525); and United States v. Henderson, *supra* (411 F.2d 224),[17] no one of the reviewing officers found the applicant sincere. The applicant admittedly was late in asserting his claim. He conceded his beliefs existed long before his induction in "theory". Cf., United States v. Pritchard (4th Cir. 1969) 413 F.2d 663, 666, cert. den. 396 U.S. 995, 90 S.Ct. 488, 24 L.Ed.2d 459. He sought to justify his tardiness in claiming exemp-

tion as a conscientious objector, despite such objections in "theory", by stating that his views matured from "theory" into concrete reality when he actually began bayonet and rifle practice. Cf., Parrott v. United States (9th Cir. 1966) 370 F.2d 388, 396, cert. den., Lawrence v. United States, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625. The sincerity of such a claim certainly is suspect. Especially is this so when it is noted that the petitioner offered at another point a somewhat contradictory excuse for his delay. Thus, he suggested—or at least strongly intimated—that his delay was due to an erroneous construction of Catholic doctrine, because of which he as a Catholic could not claim earlier exemption as a conscientious objector. This error was apparently only corrected after petitioner came under the tutelage of Father Clarke and discovered the early tenets of his faith. Moreover, by his own statement, the petitioner never expressed any prior convictions consistent with those stated in his application for designation as a conscientious objector. Despite his claims of fervent commitment to fundamental Catholic doctrine, there was nothing in his past family, religious or vocational life, both before and after induction, that lent any support to such claim.[18] As his commanding officer commented, he never, by word or act, indicated during his basic training the slightest objection to bayonet practice or rifle qualification or objection to participation in war. Yet, it was during this very period of his basic training that he asserts his convictions "crystallized". He did not, however, act promptly to proclaim his beliefs after he asserted they "crystallized". He delayed and it was not until three months afterwards that he filed this application. Moreover, there is nothing in petitioner's record to sustain the conclusion that he was reli-

---

17. In the *Welsh Case*, Justice Black pointedly observed that, "There was never any question about the sincerity and depth of Seeger's convictions as a conscientious objector, and the same is true of Welsh."

18. See, Ehlert v. United States (9th Cir. 1970) 422 F.2d 332, 334: "An adjudication on the sincerity of a registrant's conscientious objection requires an exploration in depth into his past and present family, religious and vocational life."

giously motived.[19] While he was a member of the Catholic Church, he had taken no active part in any phase of its activities. He identifies no religious work in which he had participated. Actually, his claim largely reflects what Father Clarke had told him of early Church doctrine, before St. Augustine "invented" the idea of "rational war". This seemed to have been a construction of Church history that Father Clarke had taught rather freely and it is perhaps not unfair to conclude that the petitioner was expressing more Father Clarke's views than his own in the involved statement of beliefs incorporated by the petitioner in his application. Finally, even after filing his application, he has signified a desire to resume his military training for actual participation in combat, an act which is fundamentally inconsistent with this claim.

█ It is true that the comments of the Chaplain, as well as the reviewing officer, reflect some hostility to the views held by Father Clarke. No doubt the Chaplain may have been offended by the aspersion inherent in petitioner's statements on St. Augustine. Probably both were annoyed by the large number of applications for classification as conscientious objectors, coming from a single brigade and based upon counselling from the same individual. But there were sufficient objective facts in this case, when taken together, to give a rational basis in fact to the decision of the Army that the claim of the petitioner was insincere. It might be that this Court, if free to evaluate all the facts, might have reached a different conclusion. But that is not our function in this proceeding. We are limited to determining merely whether the decision of the Army is supported by any basis in fact and we are convinced that it is. The petitioner has failed in meeting the "threshold" test and it is therefore unnecessary to enter into the complex and difficult problem of determining whether his claimed convictions meet the statutory test. For that reason, the application of the petitioner Gaydos is denied.

The second application for consideration is that of Robert J. Cohen.

## II. COHEN

The claim of the petitioner Cohen was denied because (1) his views "became fixed prior to his entry into" the Army, (2) he "does not truly hold views against participation in war in any form which are derived from religious training & belief", and (3) he "is not substantially motivated by views derived from religious training & belief". If either of such determinations finds a basis of fact in the record before the Army, then it would be sufficient to sustain the Army's denial.

Cohen is a well-educated, intelligent and extremely articulate individual, a graduate of the University of Wisconsin. He has filed a whole series of applications for classification as a conscientious objector beginning in March, 1969. In the early applications, he sought merely noncombatant status; in the last application (which is the one in controversy) he asked for discharge. In his first application for classification as a conscientious objector, he set forth in his own words in the paragraph headed "religious training and belief" this statement:

"My belief is that human life is more valuable than anything else in the world and it should never be taken by another person."

He traced this "belief" not to some recent religious or moral conversion but to the traumatic emotional effect of losing years before both his parents. Thus, he phrased it:

"The two events that proved to me that life was by far the most precious thing man has were the deaths of my

19. It is proper, it would seem, to consider his religious views, despite the decision in *Welsh.* Unlike Welsh, the petitioner bases his claim on religious conviction and not on non-religious ethical and moral grounds. His sincerity thus turns on his sincerity as a religious conviction.

parents. Their deaths turned every nerve and cell within me against the thought of imposing pain on someone else."

The petitioner at the same time identified his own religious convictions as "the religion of one's own mind. If you believe what your mind tells you and you are willing to carry it out, then your mortality (sic) is a true faith."

He cited as public evidence of his "belief" or religious conviction against participation in war in any form his active participation in the Committee to End Capital Punishment during the years 1964–68.

In a subsequent application for classification as a conscientious objector, the petitioner added another event to the two he had listed in his first application, which "led to my applying for conscientious objector". He, again, referred to the deaths of his parents as events inducing his opposition to participation to war in any form. The additional event, which he now first described as prompting his claim, was related to his stay in the Army. He found people there, who, he said, "accepted war as a way of life". He concluded, "I never knew people could be so cruel to other people just for their own gratification, but now I know. All of these horrors of the army have crystalized my beliefs and brought them to the surface." [20]

It was obvious that, under the petitioner's own statements and those of his intimates which he submitted to reinforce his various applications, his claim of conscientious objector considerably predated both his registration under Selective Service and his application under 635–20. Actually, in his applications he assumes that his claim originated before either he registered under Selective Service or his induction for he concedes delay both when registering under Selective Service and when inducted and seeks to explain such tardiness with the statement in his application: "I did not know enough about the procedures of applying." This will not, however, square with his conversations with his friend Frederick D. Berkon, as submitted by the petitioner in support of his various applications. In these conversations, he did not indicate at that time (which antedated his induction) he felt he was a conscientious objector but was ignorant of the way to apply for exemption as such. Actually, this friend quoted him as feeling "he would perform well in some peaceful capacity within the army", especially since he was "a college graduate."

■ There is clearly in this record, taking the petitioner's own statements, a basis for concluding that the petitioner's beliefs on which he applied for conscientious objector status, arose before his induction into the Army. The determination of the Army on this point thus is not without a basis in fact.

■ There is, also, a basis in fact for the Army's determination of insincerity in petitioner's claim. Such a conclusion could be rested firmly on the statement which one of the hearing officers (August 25, 1969) quoted the petitioner as having told him during this hearing, i. e., that "he (the petitioner) was merely playing a game by using legal technicalities as a means of avoiding service in a combatant MOS." That such statement was an accurate reflection of petitioner's feelings finds impressive support in other parts of the record. First of all, the petitioner did not claim to be a conscientious objector until he was detailed for Vietnam combat duty. And, even then, he was not opposed to participation in war in any form; he was only opposed to participation in an infantry combat unit in Vietnam. So much he had told his friend and fellow student, Frederick D. Berkon. He was perfectly content to participate in the military—provided he was not thrown into combat. In his early applications, he asked merely for non-combatant status and, in one at least, expressed a willingness to serve in Vietnam as a

**20.** Application of May 19, 1969.

"medic". All this was entirely inconsistent with his claim, as set forth in this his sixth application, that he is opposed to participation in war in any form. See Keefer v. United States, *supra* (313 F.2d p. 777); Negre v. Larsen (9th Cir. 1969) 418 F.2d 908, 909–910.

Another fact provides a basis for questioning the sincerity of petitioner's professions. It must be remembered that petitioner is no ill-educated person of moderate intellectual attainments; he is clearly superior both in intelligence and in education. Yet, when asked in his application for discharge in this proceeding why he had not applied for conscientious objector status in filing his classification questionnaire under Selective Service, he blandly answered, as I have already observed: "I did not know enough about the procedures of applying." [21] Coming from the petitioner, that statement is incredible. Thousands, with far less education and intelligence than the petitioner, had no difficulty with the procedures. It is expecting too much of the imagination to conceive that the petitioner did not know the method of applying—especially since it was clearly spelt out in the forms used by the petitioner. The incredibility of this statement by the petitioner provided warrant for doubting the credibility of the petitioner and this want of credibility could fairly be extended to the sincerity of his claim.

Since the Army's denial of petitioner's application may be properly sustained as having a basis in fact both on the grounds that his claim antedated his induction and the insincerity of his claim,

it would serve no useful purpose to engage in an extended analysis of the nature of his beliefs and of whether they meet the requirements recently phrased in *Welsh*.

The third application for consideration is that of Calvin C. Greene, III.

## III. GREENE

This petitioner enlisted in the Army almost two years prior to his application for discharge as a conscientious objector. Some six months before filing his application, the petitioner was married. His application was actually filed on the very day he was to report for detail to service in Vietnam. The petitioner states frankly in his petition that his religious opposition to participation in war began with his childhood church training and existed to some degree when he enlisted. His enlistment, however, according to his statement, was induced by two considerations at the time. One was the fear of embarrassment both to him and his family (his father being a Colonel in the Air Force); the other was that, by enlisting, he had some choice over his assignment and, if he had to enter military service, he sought a non-combatant unit. He accomplished his second purpose, since he was assigned to the Supply Service. He asserts that, with his marriage, his religious impulse quickened and his unalterable opposition to participation in war crystallized. In support of his claim and as evidence of his sincerity, and unlike the two petitioners whose claims have just been discussed, he submitted a letter from his religious advisor, a pastor

---

21. The fact that an application based on conscientious objector was first filed after induction is not, in itself, any bar to the granting of such application, provided the objection "crystallized" after induction. After all, AR 635–20 was authorized for the very purpose of dealing specifically with such situations. There was no other justification for such Regulation. See Bates v. Commander, First Coast Guard District, *supra* (413 F.2d p. 478). The Regulation recognized that "moral and religious values are subject to change, particularly as a young man reaches and enters maturity." Davis v. United States (8th Cir. 1969) 410 F.2d 89, 94. But the fact that he had not asserted such claim earlier, at a time when he claimed his conviction had matured, and especially his delay until he may have been assigned to Vietnam, or that he gives an implausible explanation for his delay in filing, all are circumstances that may go to credibility and sincerity. See Packard v. Rollins, *supra* (422 F.2d p. 527).

of his faith, who, on the basis of his intimate counselling with the petitioner, attested to the sincerity of petitioner's claim.

The petitioner's commanding officer disapproved the application. He based such disapproval on the ground that "until the present I have had no indication that he is or was a Conscientious Objector" and that his first indication was "on the morning before he was to report for RVN training." In reviewing this recommendation, Colonel Vail, in command of the petitioner's unit, also, recommended disapproval. Such disapproval was based on the conclusion that the petitioner's "length of service, non-combative training * * * careful reading of his application and the timing of his application * * * are, * * * prima facie evidence that his application for conscientious objector status is based essentially on political and philosophical views and, at best, reflect a personal moral code."

▮▮▮ It will be observed that both disapprovals are based primarily on the timing of the application. The fact that petitioner filed his application on the day he was to report for training for service in Vietnam was a circumstance properly to be considered, along with the other circumstances in the case, on the sincerity of the applicant's claim,[22] but, standing alone, and refuted, as to the sincerity of the application, by the conclusion of those specially designated under the Regulation to evaluate the petitioner's sincerity, it will not support disapproval. United States ex rel. Tobias v. Laird, *supra* (413 F.2d 936); Ross v. McLaughlin, *supra* (308 F.Supp. 1019). Indeed, it may even be inferred from Colonel Vail's comment that he accepted

the sincerity of petitioner's claim but found that it was not based on "religious beliefs" but on a "personal moral code," though how this latter determination was made is a matter of pure speculation.

The applicant was interviewed and his convictions were probed by the Army chaplain, who interviewed him pursuant to the Army Regulations. As a result of such interview, the Chaplain commented that "During the period of our rather lengthy interview, he (the petitioner) did not do or say anything that would cause me to question his sincerity." The psychiatrist who next examined him, concluded his report with the statement that, "There is no psychiatric objection to his request for conscientious objector status." At the same time, he was interviewed by a hearing officer, who filed a very clear report, concluding with this: "PFC Green's position appears to be genuine, and the interview produced no indications to the contrary." Because it was subsequently ascertained that this hearing officer was in the petitioner's chain of command, the petitioner was interviewed by a second hearing officer. This latter officer concluded on the basis that the petitioner had served twenty months before filing his application and then did so only after "receipt of orders for Vietnam" he was not a "conscientious objector".

On review of the record by I–O Conscientious Objector Review Board, the application was disapproved because "Applicant does not truly hold views against participation in war in any form which are derived from religious training and belief." In support of this conclusion, the Board referred to the fact that "All commanders in this case rec-

---

22. See, Application of Coryell, *supra* (307 F.Supp. at p. 212):
"It is settled that the very timing of the application is an objective fact upon which to base a determination of lack of sincerity."
See, also, Bishop v. United States, *supra* (412 F.2d at p. 1068):
"We do not suggest, of course, that sudden 'Road-to-Damascus' conversion

is impossible or even unusual; however, when such a claim is asserted the Selective Service authorities are authorized to treat its sincerity as so sufficiently suspect that the suddenness of the conversion may be considered as one of those 'objective facts before the Appeal Board * * * (which) cast doubt on the sincerity of this claim.' "

ommended disapproval of the application". It assumed that such disapproval was "a result of the timing of his application", a factor, which, standing alone and contradicted as it was by credible opinions of interviewing officers, would not warrant disapproval. The Board, also, stated that since the petitioner had served "for over one year without violating his conscience, that it is incredible that he only became a conscientious objector since the time when he received orders for Vietnam," a conclusion which would make any application filed a year or more after one's induction insincere. See Bates v. Commander, *supra* (413 F. 2d 475). Finally, it concludes that "In many respects" the petitioner was influenced by and was expressing the opinions of his wife. The Board completely disregarded, and took no note of, the reports of the chaplain, the psychiatrist and the first hearing officer and there is nothing in the record to sustain that conclusion.

On this record where the timing of the application is basically the only fact upon which any determination of insincerity rests and in the light of the strong statements in support of sincerity on the part of the chaplain and the first hearing officer, I feel constrained to conclude that there was no basis in fact for the determination against the sincerity of the petitioner's claim.

The fourth application for consideration is that of Jose L. Medina-Figueroa.

## IV. MEDINA-FIGUEROA

This petitioner is Puerto Rican by birth. His language is Spanish, though he has a rudimentary understanding of English. He had a high school education in Puerto Rico and completed one semester at Catholic University in Puerto Rico.

He, like several other petitioners, has filed a number of applications. The one involved in this proceeding was dated November 6, 1969. The applicant supplemented his application with no sup-

porting statements from others. In describing "the nature of belief which is the basis of claim", he said: "I base myself on the Commandment which states, 'Thou Shall Not Kill'." He identified the date when his conversion on which his claim was based matured as "Sunday, September 8, 1968 during the closing ceremony of the Spiritual Retreat celebrated at the Varones College" in Puerto Rico. Father Torralba was listed as the source of his training and belief. He conceded that he had not claimed exemption under Selective Service because "'I did not know that a I–O discharge could be attained (obtained)." In his testimony before this Court, he supplemented that answer. He denied that he had ever been furnished or had filled out a classification questionnaire for his Selective Service Board and thus had no opportunity, prior to induction, to assert his claim, a denial that can hardly be accorded belief.

The petitioner's commanding officer recommended disapproval of the application on the grounds of insufficiency. His brigade commander concurred in such recommendation. The psychiatrist did not recommend approval. The chaplain, who interviewed the applicant, found that "his objections to war are objections familiar to those any normal person would have" [23] and were "not deeply rooted enough in his past" to warrant approval of his request. The petitioner waived an interview before a hearing officer. The Review Board recommended disapproval on the ground of both tardiness in claim and of inadequacy of supporting evidence. Thus, in its concluding paragraph, the Board said:

> "Medina-Figueroa's statement of beliefs is very short. He waived his hearing officer. He includes no letters of reference to support his claim. He thus has failed to present adequate evidence to support his claim for discharge as a conscientious objector under AR 634–20."

23. See United States v. Curry (1st Cir. 1969) 410 F.2d 1297, 1299.

The conclusion of the Review Board seems warranted. The burden rests on the applicant to make out his claim. The only fact offered in support is the petitioner's own application. Such application is limited to reliance on a single Commandment, a Commandment accepted by most professing Christians and Jews and one which, if approved as a basis for discharge on the ground of conscientious objection would permit practically every serviceman to secure discharge. The application, also, affirmatively shows lateness in asserting claim. See United States v. Maine (10th Cir. 1969) (reh. den. January 2, 1970) 417 F.2d 951, 954. It is true that the applicant has a "language problem" and the Courts, in cases such as this, must recognize that individuals will phrase in a multitude of ways their religious or ethical views. United States v. Haughton (9th Cir. 1969) 413 F.2d 736, 742. But the record must contain, however imperfectly stated, sufficient elaboration of those views to give at least a *prima facie* basis for concluding that they meet the criteria established under the Regulation. Unfortunately, this application fails to meet such requirements.

The fifth and last application for consideration is Francisco Rivera-Pomales.

## V. RIVERA-POMALES

This petitioner has both a baccalaureate and master's degree from the University of Puerto Rico. While a student at the University, he participated for two years in the ROTC program at such institution. Inducted into the Army, he proceeded through both basic and advanced infantry training. When confronted with service in Vietnam, he filed an application for classification as a conscientious objector. In this first application, he stated that his beliefs, on which he predicated his claim, had developed through his early family and church training and during his college career, though it was "only after I trained as a soldier that I realized how totally the war and action of killing were against my religious principles." He described his religious beliefs which prompted his application as the belief "that God is the only one who can give or take human beings life". He, also, referred to his opposition to capital punishment because it denied the condemned "any opportunity to be rehabilitated". He cited the dogma of his church (i. e., Roman Catholic), which, he said, over the years, had opposed "compulsory military service" and had "condemned the war". As evidence of his prior actions indicative of opposition to participation in war in any form, he said, and supported this with letters of like purport, that he had always favored a "non-violent" resolution of problems.

His initial application was disapproved by his commanding officer, by the interviewing chaplain and by the hearing officer. The chaplain, in his report, found the applicant's expressions of belief shallow and expedient. His beliefs, the chaplain found, had no depth and were based on statements taken out of context, which the chaplain thought must have been provided the applicant and which, in part, at least, were not fully understood by him. Though he felt that the applicant did not meet the requirements of AR 635–20, the chaplain did voice the opinion that he was sincere "NOW". In his disapproval, the hearing officer noted particularly that the applicant had cited the fact that the Pope, in some connection, had quoted President Kennedy on war and the applicant quoted such statement of President Kennedy as "the official stand of Roman Catholicism".

Subsequently, the petitioner filed three other petitions for discharge as a conscientious objector. It is the last application dated October 23, 1969, that is involved in this appeal. In this last application, the petitioner repeated much of the same material he had used in other petitions. He was considerably more expansive, however, on his alleged "religious beliefs". In this final petition, he referred to the "glaring inequalities" in wealth, condemned the American policy

of expending 60 millions on war (apparently in reference to Vietnam) and letting at the same time "the rest of the word (world) fester in its nurseries (sic)." He suggested it was better to conduct war against poverty than "genocide" wars (again apparently a reference to Vietnam). He quoted from Barbara Ward, the English writer, though he did not identify her as such. He cited Father Drimas of Boston College with approval in his demand that America withdraw from Vietnam and make "massive restitution" to the Vietnamese people. The petitioner subsequently conceded to the chaplain that he had copied the above statements largely from the "Catholic Messenger".

On this record, the application was dismissed, the Board of Review concluding that:

> "Applicant does not truly hold views against participation in war in any form which are derived from religious training and belief."

 This conclusion by the Army has a basis in fact. In substantial part, the expression of belief by the petitioner is a "parrot-like" recounting of opinions of others. As stated in United States v. Brown (3d Cir. 1970) 423 F.2d 751, 754, "A conscientious objector exemption must be based upon 'subjective religious beliefs of the particular individual, not upon the religious tenets of an organization of which he is a member.'" He must in his presentation "prove his subjective and personal beliefs". He gives no clear exposition of views firmly rooted in opposition to participation in any form in war. He quotes some Scriptural sentences but basically his faith, especially as phrased in his final application, seems to be represented by opposition to the war in Vietnam. He feels it is wrong. But except for a distaste for violence (which is certainly a faith to which all law-abiding citizens feel committed), and a profession of love for Christ, he has given expression to no convictions that meet the test, either for sincerity of views or of a qualifying faith for classification as a conscientious objector. See United States v. Blackwell, *supra* (310 F.Supp. 1152).

In *Welsh, supra,* the Court extended the exemption of conscientious objector to those whose convictions are based on moral or ethical rather than religious grounds. But it emphasized that such grounds, whether moral or religious, should be "deeply rooted" and should evidence "depth" of feeling. This certainly means more than the assembling of a group of quotations from opponents of the war in Vietnam as this petitioner's application largely was. An application, to meet the test of *Welsh,* should show more than that the applicant has had access to a philosophical or ethical library or a religious journal and that he has garnered therefrom a few select phrases or quotations. Otherwise, the rules would favor the educated over those less fortunate and lend some force to the argument, increasingly being made, that conscientious objection as a basis of exemption from military service has become, through its application, "blatant class discrimination". TIME, June 29, 1970, p. 40; NEWSWEEK, June 29, 1970, p. 88. It was to avoid such a result, it is believed, the Court in the *Welsh Case* underscored the necessity that the convictions required, whether ethical as in Welsh's case or religious as in this case, must be "deeply rooted" and that those charged with review of applications for exemption should inquire not merely into the sentiments, whether moral or religious but must go further and consider the "depth" of those convictions. Clearly, the application of this petitioner, reflecting as it does more the opinions of others than his own, cannot be regarded as one compelling approval by the Army because of "deeply rooted" religious convictions personal to the applicant.

To summarize:

The petitions filed on behalf of Stephen M. Gaydos, Robert J. Cohen, Jose L. Medina-Figueroa and Francisco Rivera-Pomales are hereby denied.

The petition for a writ of *habeas corpus,* filed on behalf of Calvin C. Greene, III, is hereby granted.

All injunctive relief heretofore given any of the parties is hereby dissolved.

And it is so ordered.